LEWIS & LLEWELLYN LLP
Marc R. Lewis (Bar No. 233306)
mlewis@lewisllewellyn.com
Kenneth M. Walczak (Bar No. 247389)
kwalczak@lewisllewellyn.com
601 Montgomery Street, Suite 2000
San Francisco, California 94111
Telephone: (415) 800-0590
Facsimile: (415) 390-2127

Attorneys for Plaintiff
ALBERT RICHARDS

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# UNLIMITED JURISDICTION

| | |
|---|---|
| ALBERT RICHARDS,<br><br>                    Plaintiff,<br><br>v.<br><br>CENTRIPETAL NETWORKS, INC.; STEVEN ROGERS; JONATHAN ROGERS; and JOHN DOES 1-10,<br><br>                    Defendants. | CASE NO. 23-cv-00145-HSG<br><br>**FILED ON THE PUBLIC DOCKET, BY COURT ORDER (DOCKET NO. 38)**<br><br>**COMPLAINT FOR:**<br><br>**(1) BREACH OF CONTRACT;**<br><br>**(2) BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING;**<br><br>**(3) BREACH OF FIDUCIARY DUTY;**<br><br>**(4) CONSTRUCTIVE FRAUD;**<br><br>**(5) CONCEALMENT;**<br><br>**(6) NEGLIGENT MISREPRESENTATION;**<br><br>**(7) INTENTIONAL MISREPRESENTATION;**<br><br>**(8) UNJUST ENRICHMENT;**<br><br>**(9) VIOLATION OF CORPORATIONS CODE § 25401;**<br><br>**(10) VIOLATION OF CORPORATIONS CODE § 25403; AND**<br><br>**(11) NEGLIGENCE** |

LEWIS + LLEWELLYN LLP

**INTRODUCTION**

"Returns matter a lot. It's our capital." – Abigail Johnson, CEO, Fidelity Investments.

Plaintiff Albert Richards ("Richards") invested $500,000 in Defendant Centripetal Networks, Inc. ("Centripetal"), based on the promise of the company's patent portfolio and cybersecurity technology.  A savvy investor with more than 30 years' experience in financial services, Richards knew that all investments entail risk, and that a startup venture like Centripetal would need a significant stream of cash injections operate long enough to turn a profit.

But Richards could *not* have known or anticipated that the principals of Centripetal would deprive him of a fair opportunity to earn returns from his investment, through concealment, misrepresentations, and malfeasance.  Centripetal and the individual defendants (founder and majority owner Steven Rogers and his son Jonathan Rogers) deprived Richards of the benefit of his bargain by, among other things: mischaracterizing company debt and other liabilities, concealing or omitting key financial information, misrepresenting company finances, self-dealing, and violating generally accepted accounting principles.  All of these actions misled Richards as to value of his investment; several of them improperly diluted his investment's value.

Most importantly, Centripetal issued Richards two identical Convertible Promissory Notes— each in exchange for $250,000 of investment—guaranteeing Richards the option to convert his outstanding principal and interest into shares of the company, upon the occurrence of certain conditions.  Specifically, the Notes clearly and unambiguously guaranteed Richards the ***right to notice*** and an ***opportunity to convert***, every time Centripetal closed "***any*** sale and issuance of equity securities[.] (emphasis added)"

Yet, from 2016 through 2019, Centripetal repeatedly sold and issued equity securities (of several different types) without notifying Richards.  Indeed, Centripetal went to great lengths to ***omit*** those sales from its investors reports, including hiding and mischaracterizing them in its financial statements.  Centripetal's violation of the Note terms denied Richards the conversion opportunity to which he was entitled—while the omissions and misstatements of the company and both individual defendants prevented Richards from seeing the full financial picture, and from suspecting that sales and issuances triggering his option had likely occurred.

1

COMPLAINT

As detailed below, Centripetal's constant need for cash from 2014 to 2019 generated multiple rounds of financing (both attempted and successful), including numerous sales and issuances of equity securities.  But Centripetal disguised the true financial shape of the company with a pattern and practice of doctored financial statements and incomplete and misleading disclosures to investors, so it seemed plausible that no sales or issuance triggering the investors' rights had occurred.  In every year from 2014 onward, Centripetal engaged in some sort of accounting chicanery or deception, be it dishonesty about the use of proceeds from rounds of fundraising, classifying liabilities as equity, omitting or hiding warrant issues or option conversions, or hiding increases in authorized shares of the company.  Centripetal then compounded its deceit by directly assuring Richards that no equity transactions had occurred.

Based on the above malfeasance and misrepresentations, Richards signed a settlement agreement with Centripetal on October 19, 2019.  That agreement cancelled his notes and relinquished his rights as an investor, in exchange for payment of his principal amount ($500,000) and accrued interest ($88,801.36).  To cap off Centripetal's pattern of deceit, the agreement included an express acknowledgement and warranty by the company that "no equity securities have been issued that would give rise to [Richards's] option to convert … under Clause 4 of the Notes" and an acknowledgement that Richards assented to the agreement "***based on Centripetal's warranties***" that no such issuance had occurred.  Those warranties were false.

Had Richards received full and accurate information, and notice of every "sale and issuance of equity securities" that occurred after he purchased his Notes, he would not have settled for the break-even deal in the settlement agreement.

Beginning in November 2020, and after receiving a capitalization table that revealed the previously-undisclosed existence of over 76 million warrants and over 46 million employee stock options, Richards began to uncover Defendants' misstatements, omissions, and malfeasance.  He investigated all of the reports and financial statements Centripetal had provided him beginning in 2014, and learned that Defendants' intentional conduct (in denying his right to convert) cost him a share of the company worth as much as $26,000,000—or potentially even more.

LEWIS +
LLEWELLYN
LLP

1    By denying him the opportunity to pursue those returns as an investor, Defendants breached

2    their contract with Richards, breached their fiduciary duty and duty of good faith and fair dealing,

3    violated the California Corporations Code, and committed numerous torts.  Their 2019 agreement

4    with Richards to relinquish his rights as an investor must be voided, as obtained under false

5    pretenses and contrary to public policy.  Defendants' willful misconduct subjects them to liability

6    for punitive damages, in addition to their responsibility for making Richards whole.

7    <u>**THE PARTIES, JURISDICTION, AND VENUE**</u>

8    1.    Plaintiff ALBERT RICHARDS is a 30-year veteran of the financial services industry,

9    and the founder and Chief Executive Officer of Alambic Investment Management, LP.  He resides

10   in, and his principal place of business is in, Belvedere, California.  Until late 2019 , his principal

11   place of business was 655 Montgomery Street, San Francisco, California.

12   2.    Defendant CENTRIPETAL NETWORKS, INC. is a cybersecurity company with its

13   headquarters in Reston, Virginia.  Centripetal has purposefully availed itself of the benefits of doing

14   business in the State of California, including by conducting business with Richards and other

15   California-based investors.  This controversy arises out of Centripetal's contacts with Richards in

16   California.

17   3.    Defendant STEVEN ROGERS is the founder and majority owner of Centripetal.

18   Steven Rogers has purposefully availed himself of the benefits of doing business in the State of

19   California, including by conducting business with Richards and other California-based investors.

20   This controversy arises out of Steven Rogers's contacts with Richards in California.

21   4.    Defendant JONATHAN ROGERS is the Chief Operating Officer of Centripetal, and

22   Steven Rogers's son.  From July 2015 to June 2017, Jonathan Rogers was the Vice President of

23   Operations for Centripetal, and from May 2010 to July 2015, he was the company's Chief Financial

24   Officer.  Jonathan Rogers has purposefully availed himself of the benefits of doing business in the

25   State of California, including by conducting business with Richards and other California-based

26   investors.  This controversy arises out of Jonathan Rogers's contacts with Richards in California.

27   5.    Defendants JOHN DOES 1-10 are others involved in the unlawful and improper

28   activities described in this Complaint.  The true names or capacities, whether individual, corporate,

COMPLAINT

1   or otherwise, of these persons are unknown to Richards.  Consequently they are referred to as John

2   Does 1 through 10.  Richards will seek leave to amend this complaint to show the unknown Doe

3   Defendants' true names and capacities when they are ascertained.

4         6.      Venue is proper in this Court.  Clause 12 of the Promissory Notes binding Richards

5   and Centripetal expressly confer jurisdiction to resolve disputes arising under those notes on "ANY

6   STATE COURT LOCATED IN THE STATE OF CALIFORNIA."  **Exhibits A and B** hereto,

7   Clause 12.

8   

**FACTUAL ALLEGATIONS**

9   **Richards Purchases Two Convertible Promissory Notes for $250,000 Each**

10         7.      Richards first invested in Centripetal by purchasing Series A-2 preferred shares of the

11   company in June 2014 (and then again in September 2014).  Those shares are not the subject of this

12   Complaint.

13         8.      Richards later purchased a Convertible Promissory Note dated December 23, 2015

14   (Exhibit A) for $250,000.  That note envisioned Richards converting his principal and interest into

15   shares of an upcoming B-round, for which a term sheet had already been signed.  As further

16   inducement to Richards to enter into the note, Centripetal offered additional lucrative opportunities

17   and protections to Richards if the B-round did ***not*** happen (which it did not), including:

18         a.      Richards's unambiguous right to convert his investment "into validly issued,

19   fully paid and non-assessable shares of the [Centripetal] securities issued".  Exhibit A,

20   Clause 4.

21         b.      If Richards exercised that Option, the outstanding, un-repaid portion of his

22   investment would convert to: the same amount "divided by … the lowest price per share of a

23   share of the [securities] sold in the [applicable round] multiplied by 0.8."  *Ibid.*

24         c.      Centripetal agreed to give Richards ***written notice*** "at least 30 calendar days

25   before the closing of any" applicable round of security sales "which notice shall include a

26   summary of the material terms and conditions of the [applicable round] and copies of all of

27   the transaction documents related to such" sales, and also "any revisions to the transaction

28   documents related to such sales "within one calendar day after such documents are prepared

4

COMPLAINT

LEWIS +
LLEWELLYN LLP

and/or received (as applicable)." *Ibid*.

        d.     If an eligible round of security sales (or a change in control of the company) did not occur before ***December 23, 2016*** (the "Maturity Date"), Richards would receive the outstanding principal of his investment back, plus accrued interest. *Id*. Clause 7.

        e.     Events of Default for Centripetal included: (i) failure to timely pay Richards the principal and interest, when due; and (ii) any "default in [Centripetal's] performance of any covenant contained in this Note[.]" *Id*. Clause 10.

        f.     The Note "waives demand, notice, presentment, protest, notice of protest and notice of dishonor of this Note." *Id*. Clause 11.

        g.     Clause 13 provides (all caps in original) that Centripetal "AGREES THAT ALL OF ITS OBLIGATIONS UNDER THIS NOTE SHALL BE ABSOLUTE AND UNCONDITIONAL AND THE COMPANY HEREBY WAIVES ANY RIGHT TO ASSERT ANY SETOFF, COUNTERCLAIM OR CROSS-CLAIM."

        h.     In any Event of Default, Centripetal "shall pay all costs and expenses (including, but not limited to, court costs and reasonable attorneys fees' [*sic*] incurred by [Richards] in enforcing and collecting this Note." *Id*. Clause 8.

9.     None of the above terms and conditions were written or even negotiated by Richards—the entire agreement was solely drafted by Centripetal.  Richards signed the Note on January 4, 2016.

10.     Richards purchased a second Convertible Promissory Note dated April 12, 2016 (Exhibit B) for the sum of $250,000.  The terms of the second Note are identical to the first, including the Maturity Date.[1]

11.     The Maturity Date of both notes was extended twice—first to December 31, 2017. (**Exhibit C**), and then to June 30, 2019 (**Exhibit D**).

---

[1] Both notes state that they have been purchased by "Millennium Trust Company, LLC, Custodian, FBO: Albert Richards, Roth IRA."  Millennium Trust is simply the financial institution where Richards keeps the Roth IRA account used to purchase the notes.  Richards was the owner of both notes; Millennium Trust simply facilitated the purchase, as custodian of the IRA funds.

COMPLAINT

LEWIS +
LLEWELLYN
LLP

12.     As detailed below, the note purchases followed two years of Defendants' misstatements and omissions which made it impossible for even a savvy, experienced investor like Richards to know the actual financial condition of Centripetal.

13.     Centripetal routinely failed to comply with the requirement that it notify Richards at least 30 calendar days before the closing of any "Next Non-O3 Round" (defined in the notes as "any sale and issuance of equity securities that do not constitute" the then-anticipated B Round of financing by Option3.  Since that B Round never materialized, *all* Rounds of equity issuance after Richards's purchase were "Non-O3 Rounds").

**In 2014, Centripetal Misleads Its Investors While Struggling to Raise Funds**

14.     Centripetal's first major fundraising occurred in 2012, when it issued 16,038,492 shares of Series A Preferred Stock at a price of 24.94 cents per share, for a total investment of $4,000,000.  That entire issue of stock was purchased by Alsop Louie Partners ("Alsop Louie").

15.     Centripetal funded its 2013 cash needs with an issue of $3,495,000 in convertible notes (the "Series Notes").

16.     By early 2014, Centripetal was spending approximately $1,500,000 per quarter.

17.     Centripetal only raised $1,000,000 in additional Series Note investments in Q1 of 2014 (from a Board Member, a Company Advisor, and a single outside investor), and upon information and belief it began to make up the difference with bridge loans from Alsop Louie.

18.     Centripetal did not sell any additional Series Notes in Q2 of 2014.  Meanwhile, Alsop Louie's bridge loans reached a total of $3,645,000.

19.     In mid-2014, Centripetal conducted a Series A-2 preferred stock offering.  (An SEC Form D, filed belatedly in 2016, listed a "date of first sale" of June 12, 2014.)  In a Disclosure Schedule marketing this offering, Centripetal twice miscategorized Alsop Louie's bridge loans of more than $3.6 million as "Convertible Debt."

20.     Thus, Defendants concealed that most of this debt was not long-term financing, but was instead a short-term liability.

21.     During the 2014 preferred share and Series Note offerings Centripetal avoided providing any interim financing details, *e.g.*, a Q1 or Q2 Balance Sheet.  Had those details been

LEWIS +
LLEWELLYN
LLP

honestly presented, they would have revealed the level and nature of Centripetal's debt to Alsop Louie.

22.     Richards fell for the initial deception, and hence did not discover Defendants' malfeasance until November 2020, when he began independently researching Centripetal's finances—a long and painstaking process that included constructing a highly detailed financial model, and carefully analyzing every financial statement and offering document he had been provided, including every note therein.  (A table summarizing Centripetal's omission of warrants issued from 2014 to 2021, created by Richards as part of his analysis, appears as **Appendix 1** to this Complaint.)

23.     Also missing from the Series A-2 Preferred Share offering documents was any mention of Alsop Louie's intention to have their large bridge loan repaid before the end of 2014. Instead, the Stock Purchase Agreement merely stated that Centripetal would use the proceeds from the sale of shares "for product development and other general corporate purposes, including legal expenses; ***other debt***; and unpaid salary" (emphasis added).

24.     Centripetal raised $1.47 million in Series Notes from "outside" investors in Q3 2014, and an additional $1.75 million through the sale of Series A-2 Preferred Shares.

25.     In September 2014, Centripetal offered existing Series Note holders the option to convert their notes into Series A-2 shares.  Most inside investors, including Alsop Louie, elected not to convert.  Centripetal was having funding issues at that time, and by not converting, those noteholders preserved their "most senior creditor" status in the event of a declared bankruptcy.

26.     Nonetheless, Steven Rogers falsely stated by email on September 9, 2014 that: "We have gotten everyone to convert (from the previous $6 mm convertible note) into the A-2."

27.     In the same email, Steven Rogers also misrepresented the success of the Series A-2 offerings, stating there was only "a little bit left on the A-2, about $500k[,]".  (Steven Rogers then offered these remaining shares to existing investors, including Richards.)  In fact, Centripetal was at that time $2,750,000 short of its original $5,000,000 goal of selling A-2 shares to new investors, and $2,463,587 short of its goal of converting all $6,000,000 in Series Notes principal.

28. On information and belief, Centripetal paid off Alsop Louie's $3,645,000 bridge loan before August 31, 2014, leaving the company once again cash-poor.

29. Centripetal failed to provide any 2015 interim financials until it could present figures through August 31, 2015—at which point the "back year" financials through August 31, 2014 no longer exposed Alsop Louie's bridge loan.

30. Centripetal's financial situation worsened in Q4, as it raised only $500,000 from Series A-2 Preferred Shares, while Centripetal's cash needs remained near $1,500,000 per quarter.

31. In a cash crunch as a result of low fundraising and paying off the bridge loan, Centripetal turned back to Alsop Louie, who purchased an additional $500,000 of the Series Notes on October 31, 2014.

32. In spite of raising more than $5,000,000 in capital over the course of 2014 (including Alsop Louie's late-year Series Note purchase), Centripetal finished the year with less than $275,000 in the bank.

33. Centripetal's funding efforts at that time resembled nothing so much as a Ponzi scheme: rather than using the significant capital raised in 2014 for future business development, as said or implied in the Series A-2 Stock Purchase Agreement, Centripetal used most of the "new" capital was used to cover expenses it had ***already incurred***—including Alsop Louie's disguised bridge loan.

**In 2015, Centripetal Misrepresents Current Liabilities as "Equity"**

34. According to the Series A-2 Stock Purchase Agreement, the offer to purchase A-2 shares closed on "October 12, 2014 or at such later time as the Company and the Purchasers may mutually agree". Needing additional cash, Centripetal extended the closing date into 2015.

35. While Centripetal did raise $2,000,000 in Series A-2 Preferred share sales in Q1 of 2015, this was only one-third of its full-year cash requirements. (Net cash used in operations in 2015 was $5,947,109, slightly below the 2014 figure.)

36. With fundraising again becoming urgent, in Q2 of 2015 Centripetal sweetened the Series A-2 Preferred Share issue by adding warrants (a financial instrument that allows investors the option of purchasing additional shares at a set price in the future). This offer met with a tepid

COMPLAINT

LEWIS +
LLEWELLYN LLP

1  response.

2      37.     In July of 2015, Centripetal signed a term sheet for a $20m B-Round investment from

3  Option3 Cyber Investments ("Option3").

4      38.     With this term sheet in hand, Centripetal elected to close the Series A-2 Preferred

5  Share offering.  Jonathan Rogers stated on July 16, 2015: "The A-2 closed with a total amount

6  raised that was just over $8mm. ($8,036,413)".  That amount appears on the SEC Form D that was

7  filed belatedly on June 30, 2016.

8      39.     In August 2015, a new investor, Hudson Bay Master Fund Ltd ("Hudson Bay"),

9  invested $3,000,000 in the Series Notes.  Hudson Bay also negotiated a side letter that allowed it to

10  elect for a *cash payout* in the event of any Note Maturity or a Qualified Financial Transaction

11  ("QFT")—unlike with an equity investment, in which the principal would convert *equity* at Maturity

12  or a QFT.

13      40.     Centripetal's "Investor Report for Q3 2015" lists Hudson Bay's $3,000,000 Series

14  Note as "Equity", but the cash redemption option Centripetal gave Hudson Bay meant that note was

15  effectively debt.  (Since Hudson Bay could demand cash repayment, potentially causing

16  considerable financial stress for Centripetal—something that did, in fact, happen.)  By listing the

17  Hudson Bay investment as "Equity," Centripetal misrepresented the nature of the note and its terms.

18      41.     Hudson Bay's note also had a Maturity Date of June 1, 2016—meaning it should

19  have been shown as a "Current Liability" in Centripetal's financial statements.

20      42.     Thus, when Richards purchased his first convertible Note dated December 23, 2015

21  (Exhibit A), he was unaware of the true nature of the Hudson Bay convertible note.

22      43.     Centripetal again mischaracterized the Hudson Bay investment as "Equity", in its

23  "Annual Investor Report" sent on February 23, 2016.

24      44.     Thus, when Richards purchased his second convertible note dated April 12, 2016

25  (Exhibit B) he was still unaware of the true nature of the Hudson Bay Note.

26      45.     At the same time, Centripetal's 2015 financial statements demonstrated the

27  company's knowledge that, when issuing securities with attached warrants, a separate calculation

28  needs to be made for the additional paid-in capital associated with the warrant portion of the issue.

COMPLAINT

LEWIS +
LLEWELLYN
LLP

46.     Despite raising $5,250,000 in the first nine months or so of 2015 ($2.25m in Series A-2 Preferred Shares and $3.0m in Series Notes from Hudson Bay), cash was again getting tight. Centripetal reported "Cash Used by Operating Activities" of $5,947,109 for 2015 (excluding an additional $710,000 "Investment in Intangible Property").

47.     Meanwhile, Option3's planned B-round was delayed.  As a result, Centripetal again sought bridge financing, issuing two convertible notes to Option3 Ventures ("Option3") for $1,000,000 each in November and December 2015.

**In 2016, Clashes with Other Investors Leave Centripetal on the Verge of Bankruptcy**

48.     On April 20, 2016, Centripetal announced that it had secured $20 million in investment from Option3, in a Series B round intended to close on August 28 of that year.  Steven Rogers had informed Richards of this potential investment in July of 2015—it was the "Next O3 Round" anticipated in Clause 3 of Richards's Notes.

49.     On the same day, Hudson Bay informed Centripetal that it would exercise the cash redemption option on its $3,000,000 Series Note.  That redemption option stemmed from the aforementioned side letter, of which Richards was unaware.

50.     Hudson Bay's cash demand created a funding deficit and additional uncertainties for Centripetal, which, in turn, caused some of Option3's anticipated investors to pull out of the deal. While efforts continued for several months to salvage the transaction, ultimately the "Next O3 Round" never happened.

51.     Hudson Bay's demand also appears to have caught Centripetal by surprise— Centripetal accused Hudson Bay of intentionally sabotaging the B Round deal, Centripetal did not pay on the Maturity Date of Hudson Bay's note, and litigation followed.

52.     Richards wrote to Centripetal CFO Paul Barkworth on April 25, 2016, asking to convert his two notes, *i.e.*, exercising a right that would have been triggered by the closing of the "Next O3 Round."  *See* Exhibit A Clause 3; Exhibit B Clause 3.  Barkworth replied that he was "pleased to hear that you plan to convert, so I'd appreciate it if you will send me the signed documents, which will be held in escrow pending the closure of the round."

LEWIS +
LLEWELLYN
LLP

53.     Barkworth did ***not*** inform Richards of Hudson Bay's redemption demand or the side letter permitting Hudson Bay to make said demand.  By asking Richards to commit to the deal without disclosing the Hudson Bay situation, Barkworth materially mispresented Centripetal's financial position at the time.

54.     Likewise, Richards did not learn of Hudson Bay's lawsuit against Centripetal until November 17, 2016—five months after it was filed.  Meanwhile, on June 24, 2016, Barkworth emailed Richards that "the lead investor [in the B Round, Option3] is enthusiastic, our documentation is complete and we're aiming to close [the B Round] in July."  Barkworth again said nothing about the pending Hudson Bay litigation.

55.     Between December 31, 2015 and April 28, 2016, 39,583 Centripetal stock options with a strike price of $0.16, and 3,750 options with a strike price of $0.59, were exercised.  Share issues as the result of an options exercise are an "issuance of equity securities" triggering Richards's right to convert his Notes, under Clause 4 of both notes.  Defendants gave Richards no notice of these issuances, and offered him no associated option to convert his notes.

56.     Hudson Bay sued Centripetal in the United States District Court for the Eastern District of Virginia on or about June 17, 2016.

57.     Also on June 17, 2016, the $3,000,000 in Series Notes not owned by Hudson Bay, and mostly held by insiders, reached their newly-modified Maturity Date.  At maturity, and in the absence of a B-round of financing, those notes were due to automatically convert

> into shares of a new series of the Company's preferred stock at a per share conversion price equal to the average of (i) $0.2494, and (ii) the fair market value as of the Maturity Date of a share of the most senior preferred stock of the Company determined by a reputable valuation firm mutually acceptable to the Company and the Majority Holders.

58.     Given that Centripetal was nearly bankrupt at this point, this could have resulted in an "issuance of equity securities" at a price as low as $0.1247—again triggering the opportunity for Richards to convert.

59.     Instead, on information and belief, the Maturity Date for the Series Notes were extended to November 27, 2016.

LEWIS +
LLEWELLYN LLP

60.     With the Hudson Bay lawsuit ongoing, and with the Option3 B-Round stalled, Centripetal again faced significant cash flow difficulties.  In a July 21, 2016 email, Richards asked "Did you get your anticipated interim funding?", to which Steven Rogers replied, "No, some is expected by Friday and more next week.  Thanks for asking."

61.     That interim funding was coming from Option3, but it was slow to arrive and generally insufficient to meet Centripetal's ongoing operating expenses.  Between the end of April 2016 and the end of the year, Option3 made an additional $2,245,000 in bridge loans, bringing their total to $3,745,000.

62.     On August 29, 2016, Steven Rogers continued to assure Richards that Centripetal would close the B Round with Option3.

63.     In late 2016 and into 2017, Centripetal began to miss payroll, and the company also failed to pay the appropriate withholding taxes to the U.S. government.

64.     In September of 2016, the entire board of Centripetal, other than Steve Rogers, resigned.  Richards did not learn this had happened until some time after he became aware of the Hudson Bay lawsuit on November 17, 2016.

65.     Richards's Convertible Promissory Notes reached Maturity, entitling him to demand repayment, on December 23, 2016.

66.     Centripetal ignored the maturity date of the notes.  Richards embarked on trying to get them extended.  On February 9, 2017, Richards signed a Note Amendment extending the Maturity Date on both of his Notes to December 31, 2017.  (Exhibit C.)

67.     Upon information and belief, Centripetal issued another convertible note worth $250,000 to an unknown investor in 2016.

**In 2017, Centripetal Narrowly Avoids Bankruptcy, but Continues Deceiving Its Investors, Including Richards**

68.     Steven Rogers sent out the 2016 Centripetal Investors' Report on February 14, 2017.

69.     That report made no mention of the company being in arrears on payroll or payroll taxes, or of the entire board resigning.  Nor did it mention Hudson Bay's election to redeem its $3,000,000 investment, or the associated litigation.

COMPLAINT

LEWIS +
LLEWELLYN
LLP

70.     In the accompanying financial statements, Centripetal's liability to Hudson Bay was moved from Convertible Loan Notes (in Equity, where it never should have been, given the redemption clause) to "Accounts and Notes Payable" to reflect the fact that the liability was now current—but this movement was disguised in the Statement of Stockholder' Equity by only reporting the "Net movement on Convertible Loans."

71.     Indeed, upon careful review of Centripetal's financial statements (which Richards did after he discovered the malfeasance at the heart of this case), it is questionable whether *any* of the $8,148,279 in convertible loan notes listed in the 2016 Report as "Equity" should have been classified as such, rather than as "Liabilities."  Most of the notes included in that sum were eventually redeemed, and so were never really "Equity" at all.

72.     Despite the rosy picture presented to investors, Steven Rogers raised the possibility that Centripetal could declare bankruptcy, in both phone calls and emails with Richards in March 2017.

73.     On March 27, 2017, Hudson Bay secured a judgment against Centripetal in the amount of $3,244,110.24.  The judgment became final on April 19, 2017, and included hundreds of thousands of dollars in attorney's fees.

74.     In the first quarter of 2017, Centripetal issued 82,400 shares of stock at $0.05 per share, *again* triggering Richards's right to convert his Notes upon any "sale and issuance of equity securities" as well as Centripetal's obligations to give Richards notice of that right.

75.     On April 12, 2017, Centripetal filed an amended and restated Certificate of Incorporation increasing the number of authorized shares of common stock from 90 million to 140 million.

76.     Centripetal did not notify Richards of this change.  And even though the amendment increased authorized shares by 55.6%, Centripetal's financial reports *continued to list "Common Stock authorized" at 90,000,000 for several more years.*

77.     Beginning on April 17, 2017, Richards attempted to learn more about Centripetal's then-current efforts to raise capital.  Steven Rogers would only divulge that Alsop Louie would "approve [something] over the weekend."  Upon information and belief, what Alsop Louie approved

13

1    was the issuance of a series of 6% notes with detachable warrants that ultimately raised

2    approximately $8.5 million over the course of 2017 (plus an additional $250,000 in early 2018)—

3    *i.e.*, **another** "issuance of equity securities" that triggered Richards's right to notice, as well as the

4    right to convert his Notes.

5          78.    Moreover, Centripetal inconsistently reported this capital increase.  Its 2017 Q2

6    Investor Report and 2017 Full Year Report both classify the 6% notes with detachable warrants as

7    "Convertible Debt", described more specifically in a separate note as ***"convertible loan notes***

8    ***carrying the right to conversion into the company's Series A-2 preferred stock"***.  Whereas the

9    2018 Full Year Report classifies them as "Secured Notes Payable" in "Current Liabilities"—*i.e.*, **not**

10    **convertible, and not equity at all**.  The 2017 accounts provided in the Data Room for an early-2022

11    transaction flip-flop again, placing them back in "Convertible Debt"–again in equity but this time

12    dropping the specifying note.  Finally, the 2018 full-year financials provided in that same Data

13    Room dropped the 2017 restatement all together.

14          79.    Centripetal never issued a Q1 2017 Investors' Report to Richards.

15          80.    On July 25, 2017, Centripetal issued its Q2 2017 Investors' Report.  That report

16    contained a number of inaccuracies, violated accounting conventions, and attempted to hide the

17    2017 Note & Warrant financing.  For example, Centripetal entirely omitted the Hudson Bay

18    judgment from its "Financing" commentary.  The actual payment to Hudson Bay'appeared in the

19    Statement of Cash Flows, but it was well-disguised, showing up only as a change in "Accounts and

20    Notes payable" under the heading "Changes in operating assets and liabilities"—as opposed to a

21    debt repayment in "Cash Flows from Financing Activities", which is where it was recorded when

22    Hudson Bay first made the loan.

23          81.    Perhaps most egregiously, there is nothing in the Q2 2017 financial statements to

24    suggest that Centripetal issued any warrants at all.  The Q2 commentary made no mention of

25    warrants whatsoever, and the line for "Stock Warrants" ***was explicitly listed as zero*** in both the

26    "Statement of Operations" and the "Statement of Cash Flows".

27          82.    Centripetal also ***excluded*** from the Q2 2017 Investors' Report any mention of the

28    April 12, 2017 Amendment to the Certificate Of Incorporation that increased the authorized shares

LEWIS +
LLEWELLYN
LLP

55.6%, from 90 million to 140 million.  Centripetal omitted the amendment from its written commentary, and supplied a Balance Sheet listing the old, outdated figure (90,000,000) for the number of authorized shares.  (In fact, Centripetal continued to use the outdated 90 million figure in every financial statement up through 2020, even though a second Certificate of Incorporation amendment later increased the authorized shares to a total of ***200 million***.)

83.     Also excluded from the Q2 2017 Investors' Report—and from every other financial report Centripetal sent to investors—was any mention of the fact that the company's stock option plan had been vastly expanded.  On information and belief, most of these option grants were options Steven Rogers granted to himself, so that he could personally continue to own more than 50% of the shares outstanding.[2]

84.     On September 29, 2017, in response to a question from Richards about financing progress, Steven Rogers wrote: "We have selected a lead investor for our series B and are working to close by mid October".  If this statement were true, it meant that Centripetal was once more within 30 days of a potential sale of equity securities, triggering the notice provisions in the Richards convertible notes.  Richards received no notice.

85.     While both employee options and warrants were excluded from all of Centripetal's financial reports, Richards did receive a cap table from Centripetal in October of 2017, this in conjunction with the aforementioned potential B-round.  That cap table showed the same 518,829 "Warrants" listed in the April 2015 cap table, and included those warrants in both the "Total Outstanding Shares" and Centripetal's calculation of "Fully diluted" share ownership (accounting for 0.53% of the total).

---

[2] In June 2014, Centripetal passed an Amended and Restated Voting Agreement, including the following clause: "The vote or written consent of the holders of at least a majority of the then-outstanding shares of Common Stock shall be required to remove Steven A. Rogers as President and Chief Executive Officer of the Company and to appoint his replacement."  In other words, as long as Steven Rogers held a majority of the company's shares, no Board could ever remove him from his position as President and CEO.

With that clause in place, Steven Rogers had extra motivation to maintain the majority of outstanding shares.

COMPLAINT

86.     Oddly, in addition to the regular "Warrants" line, the October 2017 cap table also included a line for "Other Warrants", totaling 16,000,000.  These somehow-differentiated "Other Warrants" were **not** included in the Total Outstanding Shares figure, nor were they included in the "Fully diluted" share ownership calculations, implying that Centripetal had not actually issued them.

87.     On information and belief, these "Other Warrants" were, in fact, issued as of the date of the October 2017 cap table, likely in conjunction with Centripetal's 2017 financings—*i.e.*, as traditional notes with warrants attached.  But if so, Centripetal did not account for the issue correctly—it not record any increase in Additional Paid In Capital, which should have risen by an amount equal to the warrant portion of the total fair value of the note-and-warrant issues.

88.     Centripetal's lack of reporting of both its financing activities and its warrant issuances constitute material omissions and failure to provide proper notice to investors.  They also make it difficult to discern exactly what the company's funding sources were in 2017.

89.     In July of 2017, Centripetal sued Keysight Technologies Inc. ("Keysight") for patent infringement.  The cost of this lawsuit increased Centripetal's ongoing cash needs.

90.     On December 31, 2017, Richards's Notes again reached maturity.  Centripetal again did nothing.  When Richards inquired about funding in January 2018, Steven Rogers responded "On the notes, everybody got tired of doing extensions so we didn't do one."

**In 2018, Centripetal Continues to Conceal Sales and Issuance of Equity Securities, While Authorizing the Issuance of Tens of Millions of Additional Shares**

91.     The Centripetal "Investor Report – 2017 Year End" (issued April 9, 2018) contains only a single paragraph dedicated to "Financing."  That paragraph makes no mention of the previous year's fundraising, and no discussion of the 2017 Note & Warrant deal.

92.     Even though the October 2017 cap table disclosed the presence of ***16 million*** previously undisclosed "Other Warrants" (although it's unclear from that table if they were actually ***issued*** warrants), the 2017 Year End statements have no mention of any warrants at all.   Nor do they mention the significant number of additional stock options that, on information and belief, Steven Rogers granted himself as CEO and sole remaining Board Member.

LEWIS +
LLEWELLYN
LLP

93.     The financial statements at that time (indeed, in all years from 2016 forward) all avoid calculating a value of the warrants and assigning that value to Additional Paid-In Capital (which would have exposed the fact that a "sale and issuance of equity securities" occurred and triggered Richards's rights to convert).

94.     On January 22, 2018, Steven Rogers told Richards that he had "nothing new to report on financing". Yet on February 15, 2018, Centripetal filed another amended and Restated Certificate of Incorporation, this time increasing the number of authorized shares of common stock 42.9%, from 140 million to **200 million**. Centripetal did not inform Richards of this increase, and it excluded reporting these additional authorized shares in the company's Balance Sheet for several years thereafter.

95.     The 2018 Management Financial Statements show Centripetal raising $10.5 million in new capital in 2018. The Statement of Cash Flows clearly identifies this new capital as "Secured Notes Payable", which the Balance Sheet shows under "Current Liabilities"—*i.e.*, not convertible and not in "Equity." On information and belief, these were actually short-term notes **with detachable warrants**, and Centripetal increased the authorized shares on February 15, 2018 (at least in part) to accommodate this issuance of warrants. Nonetheless, Centripetal did not notify Richards that any new warrants were issued, or inform him of any sale and issuance of equity securities in 2018.

96.     The next cap table Centripetal provided Richards, dated October **2020**– well after the 2019 settlement agreement—lists 76,668,333 "Other Warrants" outstanding—some 60 million more than those disclosed in October 2017. Receipt of this cap table in 2020 first raised Richards's suspicions about Centripetal's behavior with respect to his convertible notes.

97.     Another meaningful difference between the October 2017 and October 2020 cap tables is that the 2020 table includes the "Other Warrants" in the "Total Outstanding Shares", albeit still separately from the "Stock Warrants" category.

98.     On information and belief, a significant portion, if not most of these warrants were issued in 2017 and 2018, as Centripetal's financing in those years was in the form of notes with

LEWIS +
LLEWELLYN LLP

1   detachable warrants—despite the company's efforts to portray things differently.[3]

2       99.     It stands to reason that Centripetal's 2018 Note & Warrant Financing—of which,

3   again, it gave Richards no notice, and no corresponding opportunity to convert—resulted in the

4   issuance of as many as 40 or 50 million new warrants, accounting for the vast majority of the 60

5   million new shares authorized by the February 2018 Certificate of Incorporation amendment.

6       100.    On February 13, 2018, Centripetal filed a lawsuit against Cisco Systems, Inc.

7       101.    On May 28, 2018, Richards emailed Steven Rogers to inquire about the financing

8   Steven Rogers had advertised as "very close" earlier in the month.  Steven Rogers responded: "We

9   signed Friday before last.  TS calls for closing in 30 days."

10      102.    Yet on June 23, 2018, Steven Rogers amended his estimate to "1st week of July at

11  this point[,]" and by September 28. 2018, he told Richards that the financing agreement had fallen

12  apart.

13      103.    On October 9, 2018, Centripetal reached a confidential settlement in its patent

14  litigation with Keysight.  The terms of that settlement are confidential, but in an April 2019

15  Shareholder Report Centripetal divulged a "payment for past damages" from Keysight to

16  Centripetal.

17      104.    In Centripetal's Shareholder Report for 2018, it reported total revenue of

18  $26,149,310.  This provided the company with enough to pay off the Notes from both the 2017 Note

19  & Warrant financing ($8.5 million) and the 2018 Note & Warrant financing ($10.25 million).

20      105.    Still, Centripetal's 2018 financial statements include nothing to suggest that any

21  warrants were ever issued.  This included the line for "Stock Warrants" in both the "Statement of

22  Operations" and the "Statement of Cash Flows" (once more explicitly zero in both statements).

23      106.    Misstatements became more egregious in the 2018 report, as Centripetal continued to

24  report 90 million "Authorized Shares", even though this figure had been increased to 140 million on

25  April 12, 2017 and then again to 200 million on February 18, 2019 – both via Amendments to the

26  Certificate of Incorporation.  There was also no mention of either of these increases in the

27  _____

28  [3] It is also possible, indeed likely, that additional warrants were issued in 2019 and 2020, but
    Centripetal's accounting becomes even more opaque in those years.

LEWIS +
LLEWELLYN
LLP

1    "Financing" section.  These omissions allowed Centripetal to hide not only the warrant issues, but

2    also the massive option grants that Steven Rogers appears to have given himself.

3        107.    In mid-December 2018, after lengthy discussions and nearly a year after his notes had

4    reached their extended Maturity Date of December 31, 2017, Richards and Centripetal signed

5    another note extension, to June 30, 2019 (Exhibit D).

6    **In 2019, Centripetal's Concealment and Misrepresentations Bear Fruit: Richards Agrees to**
     **Cancel His Notes for $500,000 Plus Accrued Interest**

7

8        108.    In the first half of 2019, the Series Notes were redeemed for cash, illustrating that

9    Centripetal's previous characterizations of them as "Equity" were misleading.

10       109.    When Richards asked Steven Rogers direct questions about financing in the first six

11   months of 2019, Rogers alluded to term sheets signed and potential new rounds, but did not divulge

12   anything concrete or provide the official notice required by the terms of Richards's notes.

13       110.    On June 30, 2019, the Richards Notes again hit their Maturity Date.  Centripetal

14   ignored the amended language of Clause 7 in the most recent extension (Exhibit D), requiring it to

15   immediately wire transfer to Richards the outstanding principal amount and all accrued interest.

16       111.    Richards was surprised to find Centripetal unwilling to pay the principal and interest

17   on his notes in 2019—the Notes were past due, every applicable contract required that they be paid,

18   and Centripetal (at last) had the money to pay them.

19       112.    It was only later—specifically, after November 2020, when Richards began to

20   discover Centripetal's years of omissions and malfeasance—that one possible reason for the delay

21   emerged: Centripetal knew it had sold and issued thousands of equity securities since 2016 without

22   giving Richards proper notice or honoring his right to convert.  As a result, Centripetal and the

23   individual defendants sought to compel Richards to sign a bogus settlement agreement forfeiting his

24   right to enforce the Notes, before he received his repayment.

25       113.    On August 13, 2019, Richards noted that he was currently negotiating with

26   Centripetal about redemption, extension, or conversion.  He emailed Steven Rogers that same day,

27   inquiring about Centripetal's most recent (12/31/18) balance sheet:

28

COMPLAINT

LEWIS +
LLEWELLYN LLP

> On the 12/31/2018 balance sheet you sent, I'm seeing $8.898 million in convertible debt.  Am I right in assuming that $4m of this would be Option3Ventures and $500k would be mine?  This would leave $4.398 million – could you tell me how much of this was paid off?  Has there been any additional issuance?
>
> I'm also assuming there hasn't been any movement in the common or convertible stock issues (aside from employee options) – is this right, too?

114.   It is clear from Richards's language that—thanks to Defendants' efforts at concealment—he was entirely unaware of "any sale and issuance of equity securities" (including warrants) that would have triggered his right to convert.

115.   Steven Rogers did not reply.

116.   On August 16, 2019, Richards asked for "first half" (of 2019) financials.  Steven Rogers demurred, insisting others needed to "check through them"—presumably to confirm that they did not readily disclose any sales and issuance of equity securities triggering Richards's rights.

117.   On August 21, 2019, Richards emailed Steven Rogers to convey his decision to redeem his notes, rather than converting.  His stated reasons for this again display the success of Defendants' prior deceptions, evasions, and omissions:

> At the point of my initial convertible investment, I thought a conversion to shares would be relatively close to the price I paid for the prefs, as an equity financing was thought to fairly imminent at the time.  Given all your successes (and the congratulations due therefor), it would seem that any new equity would be issued at a much higher value – and hence would have a much lower upside.  Hence redemption seems to be the logical way forward.

118.   At that moment, Richards surmised that Centripetal was now able to operate without needing to raise any additional capital.  The longer Centripetal enjoyed that status, the higher the valuation of the company would be.  When he first invested, Richards had hoped to convert at something like $0.80 (in the event of the successful completion of the then-upcoming Option3 B-round).  But now, if the company continued to do as well as Defendants' rosy statements depicted, and then issued shares at, e.g., $10, the "discounted price" at conversion would only be $8, not $0.80.  In other words, the longer Centripetal pushed out its financing date, the less attractive

LEWIS +
LLEWELLYN
LLP

1   additional investment became to Richards—***based solely on the incomplete and deceptive***

2   ***information he had been given***.

3       119.    There is no question, however, that Richards could have converted his Notes into

4   shares at a ***significantly*** lower price per share, or into warrants at a ***very*** attractive price, after any

5   number of the equity issuances triggering his rights in 2016, 2017 and 2018 (including the months

6   when Centripetal was on the verge of bankruptcy).  Richards would have done so if Centripetal had

7   been honest about its various financings and complied with the explicit notice requirements in the

8   notes.  Shares or warrants acquired by converting the notes in those years would have appreciated in

9   value many times over by 2022.

10      120.    Richards reiterated his request to redeem his notes by email on August 22, 2019.

11      121.    That same day, Steven Rogers deflected Richards's question about whether the

12  occasions on which Centripetal was "close to a number of financings" resulted in sale-and-issuance

13  triggering his rights.  This, too, constituted a failure to provide notice under Clause 4 of the Notes.

14      122.    Centripetal continued to delay, proffering various excuses for nonpayment into

15  September 2019.  At one point, Jonathan Rogers asserted that the delays were about a "closing we're

16  working through"—*i.e.*, that Centripetal was engaged in yet another sale and issuance of equity

17  securities, that would itself trigger Richards's right to convert.

18      123.    Richards responded to Jonathan Rogers, "With respect to the closing, if this is an

19  equity deal I believe my note entitles me to see the related documentation and terms."

20      124.    Jonathan Rogers did not respond.

21      125.    Nearly three months after the Maturity Date of Richards's Notes, on September 12,

22  2019, Barkworth emailed Richards a draft "Notes Cancellation, Waiver of Rights and Settlement

23  Agreement."

24      126.    On the ***very same day***, September 12, Richards directly asked Barkworth: "Are you

25  negotiating an equity raise at the moment?  I believe under the terms of the note I'm supposed to

26  receive a summary of the terms."

27      127.    Barkworth replied, "***No, this is not an equity financing.***"

28

LEWIS +
LLEWELLYN
LLP

128.    Puzzled slightly by the use of "this," Richards clarified: "the terms of the note state that if Centripetal is negotiating an equity financing, then you have an obligation to send me the terms.  So the question is: is Centripetal negotiating an equity financing with another party at present?"

129.    Barkworth replied: "***No, Centripetal is not negotiating an equity financing with another party at present.***"

130.    Richards proposed changes to the settlement agreement on September 30, 2019, including the language that became Paragraph 5a of the final agreement, in which Centripetal expressly warrants that no event triggering Richards's right to convert his notes has occurred.

131.    When Jonathan Rogers objected to the inclusion of that clause, Richards responded on October 3, 2019: "you need to rep[resent] and warrant that none of the clauses in my notes have been triggered.   You initially had me doing that – but I can't because I don't have the information." (**Exhibit E**.)

132.    The parties signed an agreement (**Exhibit F**) on October 19, 2019.

133.    In the final text of the agreement, **Centripetal** warrants that "no equity securities have been issued that would give rise to [Richards's] option to convert … [and] no notices are currently due [to Richards] under Clause 4 of the Notes[.]"  Exhibit F, ¶ 5a.  Richards then acknowledges and agrees that no event of conversion has occurred under the Notes" but does so "**based on Centripetal's warranties in 5(a) above**[.]"  *Id*., ¶ 5b.

134.    Thus Richards relied on Centripetal's misstatements to his detriment one final time.

**In 2020, Richards First Discovers Defendants' Illegal Acts and Omissions**

135.    Despite signing the fraudulently induced settlement agreement, Richards remained an investor in Centripetal (due to the Series A-2 preferred shares mentioned above, which are not a subject of this Complaint).  That meant he continued to receive investor disclosures, financial statements, and other materials from Centripetal.

136.    On October 7, 2020, Richards learned that Centripetal had obtained a $3.3 ***billion*** damages award from its lawsuit against Cisco.  (That judgment was later vacated on a finding of conflict of interest, and returned for a new trial.)

137.     From October 7 through November 6, 2020, Richards corresponded with Steven Rogers and Jonathan Rogers concerning, *e.g.*, the potential impact of the damages award on the value of his existing investment, and on the dilution of his A-2 preferred shares.  As part of those conversations, Richards repeatedly requested a cap table.

138.     On November 6, 2020, Jonathan Rogers sent Richards a cap table dated October 31, 2020.

139.     That cap table raised numerous flags for Richards.

a.     "Other Warrants" had ballooned to 76.7 million, a dramatic increase over the 16 million shown in October 2017.  Additionally, these Other Warrants were now included in "Total Outstanding Shares", whereas previously they were not, instead being listed next to "Other Authorized Shares (Not Issued)".  The number in that category stood in stark contrast to the "stock warrants" lines that had shown "zero" in the Statements of Operations and Statements of Cash Flows that Richards had reviewed for years.

b.     The number of options outstanding (on information and belief mostly options Steven Rogers had granted himself and the sole Board member of the company) had ballooned to 46,098,442, ***substantially more than the 41,725,371 common shares outstanding***.

c.      "Stock Warrants" also rose from October of 2017, although the increase was a more modest 250,000, to 768,829.

140.     Based on the above, and Jonathan Rogers's reluctance to disclose much about the warrants in their email exchange, in November 2020 Richards began to suspect for the first time that Defendants had concealed prior triggering events for his Notes, and omitted or obscured equity securities from prior financial documents and investor reports.

141.     He emailed Jonathan Rogers for clarification on what the "Other Warrants" were, and sent an email to himself (dated November 6, 2020), regarding the definition of "equity security," and whether it might apply to various types of warrants and option exercises (**Exhibit G**).

142.     Realizing that Centripetal might have concealed warrants and/or option exercises in order to avoid notifying him of the opportunity to convert his Notes, Richards began to look back at

LEWIS +
LLEWELLYN
LLP

1    the accounting treatment of those items in past financial statements and investor disclosures.

2        143.    A summary that Richards created in 2021, showing Centripetal's omission of

3    warrants that should have triggered the company's obligations under his convertible notes, appears

4    as Appendix 1 to this Complaint.

5
6    **The Illegal Acts and Omissions of Centripetal and the Individual Defendants Deprive
     Richards of the Fair Return to Which He Is Entitled**

7        144.    On April 25, 2016, Richards emailed to Barkworth: "I'm assuming I most certainly

8    am converting.  Otherwise, why did I buy the convert? ;>)"

9        145.    Had Defendants not omitted key information, violated accounting principles, and

10   intentionally concealed the sale and issuance of equity securities, Richards would have done just

11   that.  He would not have signed the October 2019 agreement, waived his rights, or redeemed his

12   notes for the outstanding principal and accrued interest.  Instead, he would have exercised his right

13   to convert those amounts into shares of Centripetal.

14       146.    At the time of the 2016 and 2017 triggers detailed above, Richards had $500,000 in

15   outstanding principal and roughly $25,000 in accrued interest.  In early 2017, the "lowest price per

16   share" sold in the applicable round, under Clause 4 of the convertible Notes, was 5 cents.

17       147.    Multiplying that price by 0.8 (as also provided for in Clause 4 of the Notes) yields a

18   share price of 4 cents.  $525,000 divided by 4 cents per share = 13.125 million shares of Centripetal.

19   In 2017, that would have entitled Richards to roughly 12% of the (then nearly bankrupt) company

20   (later diluted to approximately 6.5%).

21       148.    Of course, the point of buying stock is that one expects it to appreciate—and

22   Centripetal's has.  In early 2022, Centripetal offered to repurchase shares of the company's stock at

23   $2.13 per share (a price Richards disputes as being too low), meaning Richards's shares would have

24   been worth $26.25 million, if not more.

25       149.    Thus one measure of Richards's lost opportunities to convert is the difference

26   between $26.25 million (or more) and the sum he actually received in the fraudulently-obtained

27   settlement agreement with Centripetal, $588,801.36.

28

LEWIS +
LLEWELLYN
LLP

150.     Richards also suffered damages due to lost opportunities to convert his notes into *warrants* (as opposed to shares of the company), and damages due to the dilution of his investments by the millions of stock options Steven Rogers clandestinely issued to himself.

### FIRST CAUSE OF ACTION
### (Breach of Contract—against Centripetal)

151.     Richards realleges and incorporates by reference the allegations set forth in each of the preceding paragraphs as though fully set forth herein.

152.     As alleged herein above, Richards entered into valid written contracts with Centripetal—namely, the two Promissory Notes and the agreements extending same.

153.     Richards complied with his obligations under those contracts.

154.     Centripetal breached the contracts by not performing its obligations.  Specifically, Centripetal knowingly and repeatedly failed to give Richards notice of its sales and issuances of equity securities, failed to disclose the material terms and conditions of same, and denied Richards his contractually-guaranteed opportunity to convert his Notes into validly issued, fully paid and non-assessable shares of the securities issued.

155.     Centripetal's breach extended to the fraudulently obtained 2019 settlement agreement, which Richards signed based on Defendants' years of misstatements, omissions, and concealments.  Centripetal falsely warranted, in Paragraph 5a of that agreement, that "no event of conversion" had occurred to trigger Richards's conversion rights.

156.     As a result, Richards suffered damages, including the loss of his ability to earn a fair return on his investment, as he would have if he possessed full and accurate information.

157.     Richards was harmed by Centripetal's actions and was damaged in an amount to be proved at trial.

158.     Centripetal's conduct was a substantial factor in causing harm to Richards.

### SECOND CAUSE OF ACTION
### (Breach of the Implied Covenant of Good Faith and Fair Dealing—against Centripetal)

159.     Richards realleges and incorporates by reference the allegations set forth in each of the preceding paragraphs as though fully set forth herein.

LEWIS +
LLEWELLYN
LLP

160.    Every contract imposes upon each party a duty of good faith and fair dealing.

161.    Centripetal violated its duty of good faith and fair dealing when it knowingly and willfully deprived Richards of the benefit of his convertible Notes, by obscuring, omitting, or outright denying the existence of the triggering events that gave rise to Richards's right to convert.

162.    Centripetal's violation of its duty of good faith and fair dealing damaged Richards.  It resulted in Richards signing an unjust and invalid settlement agreement in 2019, and in Richards deciding to seek redemption of his Notes rather than conversion—because he accepted Centripetal's representations that he had no right to convert before 2019.  Finally, it denied Richards the ability to earn a fair return on his investment, as he would have if he possessed full and accurate information.

163.    Richards was harmed by Centripetal's actions and was damaged in an amount to be proved at trial.

164.    Centripetal's conduct was a substantial factor in causing harm to Richards.

### THIRD CAUSE OF ACTION
### (Breach of Fiduciary Duty—against All Defendants)

165.    Richards realleges and incorporates by reference the allegations set forth in each of the preceding paragraphs as though fully set forth herein.

166.    A fiduciary relationship existed between Richards and each of the Defendants. Richards entrusted Centripetal and its officers and directors, including those named herein as Defendants, with his investment money; Richards relied on Defendants to comply with their legal obligations and to provide full, accurate, and truthful information to allow Richards to act as an informed investor and to exercise his rights as guaranteed by the Notes.

167.    Richards also relied on Defendants to refrain from self-dealing in a manner detrimental to the company and his investments—for example, not diluting the value of his present or future shares by clandestinely issuing thousands of stock options to Steven Rogers.

168.    Defendants knowingly and voluntarily undertook to act on behalf of and for the benefit of Richards.

169.    Defendants owed fiduciary duties to Richards, including the duty to act with the utmost good faith in the best interests of Richards, and to refrain from self-dealing.

170.   As alleged herein above, Defendants, including Centripetal and all individual defendants, failed to act as reasonable fiduciaries would have acted under the same or similar circumstances.

171.   As alleged herein above, Defendants, including Centripetal and all individual defendants, also failed to act in the best interests of Richards, and instead acted in their own self-interest, subordinated Richards's interests to their own interests and engaged in numerous activities to the detriment of Richards, and did so without Richards's knowledge or consent.

172.   As alleged herein above, Defendants undertook direct actions and omissions which caused harm to Richards's investments and caused Richards to lose the right to make a fair return on his investment, as he would have if he possessed full and accurate information.

173.   Richards was harmed by Defendants' actions and was damaged in an amount to be proved at trial.

### FOURTH CAUSE OF ACTION
### (Constructive Fraud—against All Defendants)

174.   Richards realleges and incorporates by reference the allegations set forth in each of the preceding paragraphs as though fully set forth herein.

175.   A fiduciary relationship existed between Richards and each of the Defendants.

176.   Richards entrusted Centripetal and its officers and directors, including those named herein as Defendants, with his investment money; Richards relied on Defendants to comply with their legal obligations and to provide full, accurate, and truthful information to allow Richards to act as an informed investor and to exercise his rights as guaranteed by the Notes.

177.   Defendants knowingly and voluntarily undertook to act on behalf of and for the benefit of Richards.

178.   Defendants owed fiduciary duties to Richards, including the duty to act with the utmost good faith in the best interests of Richards.

179.   As alleged herein above, Defendants possessed information material to Richards's interests relating to the finances of Centripetal, and specifically Centripetal's efforts to raise capital by means of, *inter alia*, sales and issuance of equity securities.

LEWIS +
LLEWELLYN ᴸᴸᴾ

180.   As alleged herein above, Defendants knew or should have known that this information was material to Richards's interest.

181.   As alleged herein above, Defendants failed to disclose this material information to Richards.

182.   Richards would have acted differently and would not have been damaged if Defendants had not breached their duties, had not made false representations, and had not omitted to inform Richards of material facts known to them, or material facts they should have known.

183.   Richards was harmed by Defendants' actions and was damaged in an amount to be proved at trial.

184.   Defendants' acts and omissions were substantial factors in causing Richards harm.

**FIFTH CAUSE OF ACTION**
**(Concealment—against All Defendants)**

185.   Richards realleges and incorporates by reference the allegations set forth in each of the preceding paragraphs as though fully set forth herein.

186.   A fiduciary relationship existed between Richards and each of the Defendants.

187.   Richards entrusted Centripetal and its officers and directors, including those named herein as Defendants, with his investment money; Richards relied on Defendants to comply with their legal obligations and to provide full, accurate, and truthful information to allow Richards to act as an informed investor and to exercise his rights as guaranteed by the Notes.

188.   Defendants knowingly and voluntarily undertook to act on behalf of and for the benefit of Richards.

189.   Defendants owed fiduciary duties to Richards, including the duty to act with the utmost good faith in the best interests of Richards.

190.   As alleged herein above, Defendants had exclusive knowledge of material facts and intentionally concealed, suppressed, and failed to disclose facts to Richards relating to Richards's investments, the finances of Centripetal, and specifically the sale and issuance of equity securities, which harmed Richards's interests and subordinated his interests to the interests of Defendants.

LEWIS +
LLEWELLYN
LLP

191.     As a result, Richards did not know of material facts relating to his investments, the finances of Centripetal, and specifically the sale and issuance of equity securities, as well as Defendants' own actions that harmed Richards's interests and subordinated his interests to the interests of Defendants.

192.     As alleged herein above, had Defendants disclosed the concealed facts, Richards would have acted differently, would not have signed the fraudulently obtained 2019 settlement agreement, and would not have been harmed.

193.     Richards was harmed by Defendants' actions and was damaged in an amount to be proved at trial.

194.     Defendants' acts and omissions were substantial factors in causing Richards harm.

**SIXTH CAUSE OF ACTION**
**(Negligent Misrepresentation—against All Defendants)**

195.     Richards realleges and incorporates by reference the allegations set forth in each of the preceding paragraphs as though fully set forth herein.

196.     As alleged herein above, Defendants made representations to Richards regarding his investments with Centripetal, and the company's finances.

197.     As alleged herein above, those representations were false.

198.     Defendants had no reasonable ground for believing the representations to be true when they were made.

199.     Defendants intended Richards to rely on their misrepresentations.

200.     Richards reasonably relied on Defendants' misrepresentations.

201.     As alleged herein above, Richards would have acted differently, would not have signed the fraudulently obtained 2019 settlement agreement, and would not have been harmed, but for Defendants' misrepresentations.

202.     Richards was harmed by Defendants' misrepresentations and was damaged in an amount to be proved at trial.

203.     Defendants' misrepresentations, and Richards's reliance thereupon, were substantial factors in causing Richards harm.

LEWIS +
LLEWELLYN LLP

**SEVENTH CAUSE OF ACTION**
**(Fraud – Intentional Misrepresentation—against All Defendants)**

204.    Richards realleges and incorporates by reference the allegations set forth in each of the preceding paragraphs as though fully set forth herein.

205.    As alleged herein above, Defendants made representations to Richards regarding his investments with Centripetal, and the company's finances.

206.    As alleged herein above, those representations were false.

207.    Defendants knew the representations were false when made, and/or they were made recklessly and without regard for their truth.

208.    Defendants intended Richards to rely on their misrepresentations.

209.    Richards reasonably relied on Defendants' misrepresentations.

210.    As alleged herein above, Richards would have acted differently, would not have signed the fraudulently obtained 2019 settlement agreement, and would not have been harmed, but for Defendants' misrepresentations.

211.    Richards was harmed by Defendants' misrepresentations and was damaged in an amount to be proved at trial.

212.    Defendants' misrepresentations, and Richards's reliance thereupon, were substantial factors in causing Richards harm.

213.    Defendants' conduct as alleged herein, was unconscionable, fraudulent, oppressive, malicious and done intentionally or in conscious disregard of Richards's rights and in order to further their own financial self-interest at Richards's expense so as to justify an award of punitive damages.

**EIGHTH CAUSE OF ACTION**
**(Unjust Enrichment—against All Defendants)**

214.    Richards realleges and incorporates by reference the allegations set forth in each of the preceding paragraphs as though fully set forth herein.

215.    As alleged herein above, as a result of their unlawful acts and omissions, Defendants received financial and economic benefit at the expense of Richards.

LEWIS +
LLEWELLYN LLP

216.     As alleged herein above, Richards suffered harm as a result of Defendants' actions in obtaining an economic benefit.

217.     Defendants' retention of that economic benefit at the expense of Richards is unjust.

218.     As a direct and proximate result of the allegations above, Defendants have been unjustly enriched at the expense of Richards in an amount to be proved at trial.

219.     Richards reasonably relied on Defendants' misrepresentations.

220.     As alleged herein above, Richards would have acted differently, would not have signed the fraudulently obtained 2019 settlement agreement, and would not have been harmed, but for Defendants' misrepresentations.

221.     Richards was harmed by Defendants' misrepresentations and was damaged in an amount to be proved at trial.

222.     Defendants' misrepresentations, and Richards's reliance thereupon, were substantial factors in causing Richards harm.

223.     Defendants' conduct as alleged herein, was unconscionable, fraudulent, oppressive, malicious and done intentionally or in conscious disregard of Richards's rights and in order to further their own financial self-interest at Richards's expense so as to justify an award of punitive damages.

### NINTH CAUSE OF ACTION
**(Violation of Corporations Code § 25401—against All Defendants)**

224.     Richards realleges and incorporates by reference the allegations set forth in each of the preceding paragraphs as though fully set forth herein.

225.     As alleged herein above, Defendants made numerous untrue statements of material fact and omitted to state material facts in inducing Richards to invest his funds with Centripetal, to keep his funds invested in Centripetal, to refrain from converting his Notes, and to sign a fraudulently-obtained settlement agreement.

226.     Defendants' investments in Centripetal included purchases of securities.

227.     Defendants intended Plaintiff to rely on their representations and intended to induce Richards to purchase the securities, retain his investments in Centripetal, refrain from converting his

31
COMPLAINT

1  Notes, and sign a fraudulently-obtained settlement agreement.

2    228.   Richards reasonably relied on the representations in deciding to purchase the

3  securities, not to sell the securities, not to convert the Notes, and to sign the settlement agreement.

4    229.   Richards was harmed by Defendants' misrepresentations and was damaged in an

5  amount to be proved at trial.

6    230.   Defendants' misrepresentations, and Richards's reliance thereupon, were substantial

7  factors in causing Richards harm.

8    231.   Defendants' conduct as alleged herein, was unconscionable, fraudulent, oppressive,

9  malicious and done intentionally or in conscious disregard of Richards's rights and in order to

10  further their own financial self-interest at Richards's expense so as to justify an award of punitive

11  damages.

12                                **TENTH CAUSE OF ACTION**
                **(Violation of Corporations Code § 25403—against Individual Defendants)**
13

14    232.   Richards realleges and incorporates by reference the allegations set forth in each of

15  the preceding paragraphs as though fully set forth herein.

16    233.   As alleged herein above, Defendants made numerous untrue statements of material

17  fact and omitted to state material facts in inducing Richards to invest his funds with Centripetal (and

18  to keep his funds invested in Centripetal, to refrain from converting his Notes, and to sign a

19  fraudulently-obtained settlement agreement) in violation of Calfornia Corporations Code § 25401.

20    234.   Individual Defendants Steven Rogers and Jonathan Rogers are control persons of

21  Centripetal.

22        a.    Steven Rogers is the founder and majority owner of Centripetal and directly

23    controls the actions of Centripetal.   As alleged herein above, for some of the relevant time

24    period, Steven Rogers was the sole Board Member of Centripetal.

25        b.    Jonathan Rogers is the Chief Operating Officer of Centripetal and directly or

26    indirectly controls the actions of Centripetal.

27    235.   California Corporations Code § 25403 imposes liability on persons who, with

28  knowledge, directly or indirectly control an entity liable under Corporations Code § 25401.

LEWIS +
LLEWELLYN
LLP

236.    Steven Rogers and Jonathan Rogers are liable for the harm to Richards.

237.    Defendants' conduct as alleged herein, was unconscionable, fraudulent, oppressive, malicious and done intentionally or in conscious disregard of Richards's rights and in order to further their own financial self-interest at Richards's expense so as to justify an award of punitive damages.

**ELEVENTH CAUSE OF ACTION**
**(Negligence—against All Defendants)**

211.    Richards realleges and incorporates by reference the allegations set forth in each of the preceding paragraphs as though fully set forth herein.

212.    Defendants had a duty to Richards to act reasonably carefully in the administration, management, and handling of his investments and to deal with him as an investor within the standard of care.

213.    Defendants fell below the standard of care and were negligent.

214.    As alleged herein above, Defendants failed to use the skill and care that reasonably careful corporate officers, directors, and fiduciaries would have used in similar circumstances.

215.    As alleged herein above, as a direct and proximate result of Defendants' negligence, Richards was harmed.

216.    Defendants' conduct was a substantial factor in causing harm to Richards and Richards would not have suffered the harm but for Defendants' negligence.

**PRAYER FOR RELIEF**

WHEREFORE, Richards prays for relief as set forth below:

1.    Rescission of the fraudulently-obtained 2019 settlement agreement;

2.    A declaration that the 2019 settlement agreement is void as contrary to public policy pursuant to Civil Code Section 1668 ("All contracts which have for their object, directly or indirectly, to exempt anyone from responsibility for his own fraud … are against the policy of the law.");

3.    Enforcement of Clause 13 of the Promissory Notes, stating that Centripetal's obligations under the Notes are absolute and unconditional, and waiving Centripetal's right to assert

33

LEWIS +
LLEWELLYN
LLP

any setoff, counterclaim, or cross-claim;

4.   Compensatory and general damages according to proof;

5.   Consequential damages;

6.   Punitive damages, as set forth above;

7.   Pre- and post-judgment interest as provided by law;

8.   All reasonable attorney's fees, costs, and expenses as provided under Clause 8 of the Promissory Notes, and to the full extent provided for by law;

9.   Costs of suit herein incurred as provided by law; and

10.  Such other and further relief as the Court deems necessary, just, and proper.

Dated:  December 9, 2022

LEWIS & LLEWELLYN LLP

By:   Kenneth M. Walczak

Attorneys for Plaintiff Albert Richards

COMPLAINT

LEWIS + LLEWELLYN LLP

# APPENDIX 1

## Table summarizing Centripetal's omission of warrants issued from 2014 to 2021

| Report | Period End | Per | Warrants in Commentary | Warrants in Balance Sheet | Warrants in Stmt of Operations | Warrants in Stmt of Cash Flows | Warrants in Stmt of Stockholders' Equity | Authorized Common Shares Reported | Actual |
|---|---|---|---|---|---|---|---|---|---|
| 2014 Full Year | 12/31/2014 | Yr | -- | no | Stock Warrants = 0 | Stock Warrants = 0 | no mention | 90 | 90 |
| | 12/31/2013 | x | -- | -- | -- | -- | -- | -- | -- |
| 2015 Q1 | 3/31/2015 | Q1 | no mention | no | Stock Warrants = 0 | Stock Warrants = 0 | no mention | 90 | 90 |
| | 3/31/2014 | x | -- | -- | -- | -- | -- | -- | -- |
| 2015 8m | 8/31/2015 | 8m | no mention | no | Stock Warrants = 0 | Stock Warrants = 0 | -- | 90 | 90 |
| | 8/31/2014 | 8m | -- | no | Stock Warrants = 0 | Stock Warrants = 0 | -- | | |
| 2015 Full Year | 12/31/2015 | Yr | no mention | no | Stock Warrants = 0 | Stock Warrants = 0 | no mention | 90 | 90 |
| | 12/31/2014 | x | -- | -- | -- | -- | -- | -- | -- |
| 2016 Full Year | 12/31/2016 | Yr | no mention | no | Stock Warrants = 0 | Stock Warrants = 0 | no mention | 90 | 90 |
| | 12/31/2015 | Yr | -- | no | -- | -- | -- | | |
| 2017 H1 | 6/30/2017 | 6m | no mention | no | Stock Warrants = 0 | Stock Warrants = 0 | no mention | 90 | 140 |
| | 6/30/2016 | x | -- | -- | -- | -- | -- | -- | -- |
| 2017 Full Year | 3/31/2017 | Q1 | -- | no | no mention | Stock Warrants = 0 | -- | -- | -- |
| | 6/30/2017 | Q2 | -- | no | no mention | Stock Warrants = 0 | -- | -- | -- |
| | 6/30/2017 | Q3 | -- | no | no mention | Stock Warrants = 0 | -- | -- | -- |
| | 12/31/2017 | Q4 | -- | no | no mention | Stock Warrants = 0 | -- | -- | -- |
| | 12/31/2017 | Yr | no mention | no | no mention | Stock Warrants = 0 | -- | 90 | 140 |
| | 12/31/2016 | x | -- | -- | -- | -- | -- | -- | -- |
| 2018 Full Year | 12/31/2018 | Yr | no mention | no | Stock Warrants = 0 | Stock Warrants = 0 | -- | 90 | 200 |

| Report | Period End | Per | Warrants in Commentary | Warrants in Balance Sheet | Warants in Stmt of Operations | Warrants in Stmt of Cash Flows | Warrants in Stmt of Stockholders' Equity | Authorized Common Shares Reported | Actual |
|---|---|---|---|---|---|---|---|---|---|
| | 12/31/2017 | Yr | -- | no | Stock Warrants = 0 | Stock Warrants = 0 | -- | -- | -- |
| 2019 Half Year | 6/30/2010 | 6m | -- | no | Stock Warrants = 0 | Stock Warrants = 0 | -- | 90 | 200 |
| | 6/30/2019 | x | -- | -- | -- | -- | -- | -- | -- |
| 2019 Full Year | 12/31/2019 | Yr | no mention | no | Stock Warrants = 0 | Stock Warrants = 0 | -- | 90 | 200 |
| | 12/31/2018 | x | -- | -- | -- | -- | -- | -- | -- |
| 2015 Data Room | 3/31/2015 | Q1 | -- | no | Stock Warrants = 0 | -- | -- | -- | -- |
| | 6/30/2015 | Q2 | -- | no | Stock Warrants = 0 | -- | -- | -- | -- |
| | 9/30/2015 | Q3 | -- | no | Stock Warrants = 0 | -- | -- | -- | -- |
| | 12/31/2015 | Yr | -- | no | Stock Warrants = 0 | -- | -- | 90 | 90 |
| | 12/31/2014 | x | -- | -- | -- | -- | -- | -- | -- |
| 2016 Data Room | 12/31/2016 | Yr | -- | no | Stock Warrants = 0 | Stock Warrants = 0 | no mention | 90 | 90 |
| 2017 Data Room | 12/31/2017 | Yr | -- | no | no mention | Stock Warrants = 0 | -- | 90 | 140 |
| 2018 Data Room | 12/31/2018 | Yr | -- | no | no mention | Stock Warrants = 0 | -- | 90 | 200 |
| 2019 Data Room | 12/31/2019 | Yr | -- | no | Stock Warrants = 0 | Stock Warrants = 0 | -- | 90 | 200 |
| 2020 Data Room | 12/31/2010 | Yr | -- | no | Stock Warrants = 0 | Stock Warrants = 0 | -- | 200 | 200 |
| 2021 Data Room | 10/31/2021 | 10m | -- | no | Stock Warrants = 0 | Stock Warrants = 0 | -- | 200 | 200 |

# Exhibit A

THIS CONVERTIBLE PROMISSORY NOTE AND THE SECURITIES ISSUABLE UPON THE CONVERSION HEREOF HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR UNDER THE SECURITIES LAWS OF ANY STATES IN THE UNITED STATES. THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE ACT AND THE APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. THE ISSUER OF THESE SECURITIES MAY REQUIRE AN OPINION OF COUNSEL IN FORM AND SUBSTANCE SATISFACTORY TO THE ISSUER TO THE EFFECT THAT ANY PROPOSED TRANSFER OR RESALE IS IN COMPLIANCE WITH THE ACT AND ANY APPLICABLE STATE SECURITIES LAWS.

### CONVERTIBLE PROMISSORY NOTE

**$250,000.00**                                                      **December 23, 2015**

For value received **CENTRIPETAL NETWORKS, INC.**, a Delaware corporation ("**Payor**" or the "**Company**"), promises to pay to **MILLENNIUM TRUST COMPANY, LLC, CUSTODIAN, FBO: ALBERT RICHARDS, ROTH IRA, 226 821 528** or its assigns ("**Holder**") the principal sum of Two Hundred Fifty Thousand Dollars **($250,000)** plus simple interest on the outstanding principal amount at the rate of 5% per annum. Interest shall accrue on a day-to-day basis beginning on the date of issuance of this Convertible Promissory Note (this "**Note**") and continuing until the outstanding principal is paid or converted in full. Interest shall be computed on the basis of a year of 365 days for the actual number of days elapsed. All unpaid interest and principal shall be due and payable on the Maturity Date (as defined below), unless earlier converted as provided herein.

1.      All payments of interest and principal under this Note shall be in lawful money of the United States of America. All payments shall be applied first to any costs or expenses incurred by the Holder in connection with the enforcement and/or collection of this Note (pursuant to Section 8 below), second to accrued interest, and thereafter to principal.

2.      In no event shall the amount of interest due or payable under this Note exceed the maximum rate of interest allowed by applicable law and, in the event any such payment is inadvertently paid by the Company or inadvertently received by the Holder, then such excess sum shall be credited as a payment of principal. It is the express intent of the parties hereto that the Company not pay and the Holder not receive, directly or indirectly, in any manner whatsoever, interest in excess of that which may be lawfully paid by the Company under applicable law.

3.      At the closing of the next sale and issuance by the Company (the "**Next O3 Round**") of equity securities (the "**Future O3 Stock**") in which the Company receives gross proceeds of at least $5,000,000.00 from **OPTION 3 CYBER INVESTMENTS, LLC** and/or one of its Affiliates (as defined below) (including any principal and interest outstanding under this Note that converts into Future O3 Stock), this Note (and all amounts due hereunder, including the outstanding principal amount and all accrued but unpaid interest thereon (collectively, the "**Conversion Amount**")) shall be automatically converted into validly issued, fully paid and non-assessable shares of the Future O3 Stock. The number of shares of the Future O3 Stock issuable to the Holder upon the conversion of this Note in connection with the Next O3 Round, shall be equal to: (a) the then outstanding Conversion Amount; divided by (b) the lowest price per share of a share of the Future O3 Stock sold in the Next O3 Round. As used in this Note, the term "**Affiliate**" shall mean, with respect to any person or entity, any other person or entity

who, directly or indirectly, controls, is controlled by, or is in common control with such person or entity, including, without limitation, any general partner, manager, officer, director or equity owner now or hereafter existing that controls or is controlled by such person or entity.

4.       If the Company closes any sale and issuance of equity securities that do not constitute a Next O3 Round (each a "*Next Non-O3 Round*"), the Holder, at its option as evidenced by a written notice delivered to the Company, may elect to convert this Note (and all then outstanding Conversion Amount) into validly issued, fully paid and non-assessable shares of the securities issued in the Next Non-O3 Round (the "*Future Non-O3 Stock*"). The number of shares of the Future Non-O3 Stock issuable to the Holder upon the conversion of this Note in connection with a Next Non-O3 Round, shall be equal to: (a) the then outstanding Conversion Amount; divided by (b) the lowest price per share of a share of the Future Non-O3 Stock sold in the Next Non-O3 Round multiplied by 0.8. The Company agrees that it shall: (i) give written notice to the Holder at least 30 calendar days prior to the closing of any Next Non-O3 Round which notice shall include a summary of the material terms and conditions of the Next Non-O3 Round and copies of all of the transaction documents related to such Next Non-O3 Round; and (ii) provide the Holder with any revisions to the transaction documents related to such Next Non-O3 Round within one calendar day after such documents are prepared and/or received (as applicable).

5.       If the principal and interest outstanding under this Note converts into Future O3 Stock or Future Non-O3 Stock pursuant to the terms of Section 3 or 4 above: (a) the parties agree that no fractional shares shall be issued upon the conversion of this Note and in lieu of issuing any fractional shares, the Company shall pay to the Holder cash equal to such fraction multiplied by the price per share at which the Note converts; (b) as promptly as practicable after the date of conversion of this Note (but in no case later than ten (10) business days thereafter), the Company, at its expense, will issue and deliver to the Holder a certificate for the number of shares of Future O3 Stock or Future Non-O3 Stock issuable upon conversion of this Note; and (c) the Company shall pay any and all issue and other taxes that may be payable in respect of any issuance or delivery of shares of Future O3 Stock or Future Non-O3 Stock on conversion of this Note pursuant hereto. Upon conversion and delivery of the certificate evidencing the Future O3 Stock or Future Non-O3 Stock: (i) this Note shall become fully paid and satisfied; and (ii) the Holder shall surrender this Note, duly endorsed as "Paid in Full", to the Company.

6.       Notwithstanding the above, if a Change of Control (as defined below) is consummated prior the earlier of: (a) the Maturity Date; or (b) a conversion of this Note pursuant to the terms of Sections 3 or 4 above, then the Company shall immediately upon such consummation of the Change of Control pay to the Holder a cash payment equal to two times the principal amount of the Note and any unpaid, accrued interest. After the receipt of such payment: (i) this Note shall become fully paid and satisfied; and (ii) the Holder shall promptly surrender this Note, duly endorsed as "Paid in Full", to the Company. For purposes of this Note, a "*Change of Control*" shall mean: (x) a consolidation or merger of the Company with or into any other corporation or other entity or person, or any other corporate reorganization, other than any such consolidation, merger or reorganization in which the shares of capital stock of the Company immediately prior to such consolidation, merger or reorganization, continue to represent a majority of the voting power of the surviving entity immediately after such consolidation, merger or reorganization; (y) any transaction or series of related transactions in which in excess of fifty percent (50%) of the Company's voting power is transferred; *provided* that a Change of Control shall not include any transaction or series of transactions principally for bona fide equity financing purposes in which cash is received by the Company or any successor or indebtedness of the Company is cancelled

or converted or a combination thereof; or (z) any sale, lease, transfer, exclusive license or other disposition of all or substantially all of the Company's assets.

7.      If the Company has not consummated a Next O3 Round, a Next Non-O3 Round into which this Note converts or a Change of Control on or before December 23, 2016 (the "*Maturity Date*"), then the Company shall pay to the Holder on the Maturity Date all amounts due hereunder, including, but not limited to, the outstanding principal amount and all accrued but unpaid interest thereon, by wire transfer in immediately available funds pursuant to wiring instructions provided by the Holder.

8.      In the event of any Event of Default (as defined below) hereunder, Payor shall pay all costs and expenses (including, but not limited to, court costs and reasonable attorneys fees') incurred by the Holder in enforcing and collecting this Note.

9.      Payor may not prepay this Note without the prior written consent of the Holder.

10.     If there shall be any Event of Default hereunder, at the option and upon the declaration of the Holder of this Note and upon written notice to the Payor (which declaration and notice shall be deemed to have been automatic in the case of an Event of Default under Section 10(iii) or 10(iv)): (a) this Note shall accelerate and all principal and unpaid accrued interest then outstanding shall become due and payable; and (b) the Holder may exercise any and all rights and remedies available to it at law, in equity or otherwise.  The occurrence of any one or more of the following shall constitute an "**Event of Default**":

(i)      Payor fails to pay timely any of the principal amount due under this Note on the date the same becomes due and payable or any accrued interest or other amounts due under this Note on the date the same becomes due and payable;

(ii)     Payor shall default in its performance of any covenant contained in this Note;

(iii)    Payor files any petition or action for relief under any bankruptcy, reorganization, insolvency or moratorium law or any other law for the relief of, or relating to, debtors, now or hereafter in effect, or makes any assignment for the benefit of creditors or takes any corporate action in furtherance of any of the foregoing; or

(iv)     An involuntary petition is filed against Payor (unless such petition is dismissed or discharged within sixty (60) calendar days under any bankruptcy statute now or hereafter in effect) or a custodian, receiver, trustee, assignee for the benefit of creditors (or other similar official) is appointed to take possession, custody or control of any property of Payor;

11.     Payor hereby waives demand, notice, presentment, protest, notice of protest and notice of dishonor of this Note.

12.     This Note shall be governed by and construed under the laws of the State of California, as applied to agreements among California State residents, without giving effect to conflicts of laws principles of any jurisdiction that would result in the laws of any other jurisdiction applying to this Note. THE COMPANY AND THE HOLDER HEREBY AGREE THAT ANY CLAIMS OR DISPUTES BETWEEN THE COMPANY AND THE HOLDER PERTAINING DIRECTLY OR INDIRECTLY TO THIS NOTE SHALL BE BROUGHT IN A FEDERAL COURT IN THE STATE OF CALIFORNIA, OR ANY STATE COURT LOCATED IN THE STATE OF CALIFORNIA AND THAT SUCH COURT SHALL HAVE JURISDICTION TO HEAR AND DETERMINE ANY SUCH CLAIMS.   THE

COMPANY AND THE HOLDER EXPRESSLY SUBMIT AND CONSENT IN ADVANCE TO SUCH JURISDICTION IN ANY ACTION OR PROCEEDING COMMENCED IN SUCH COURTS. FURTHER, THE COMPANY AND THE HOLDER HEREBY WAIVE THE RIGHT TO ASSERT THE DEFENSE OF FORUM NON CONVENIENS AND THE RIGHT TO CHALLENGE THE VENUE OF ANY COURT PROCEEDING. THE COMPANY AND THE HOLDER EACH ACKNOWLEDGE THAT ANY DISPUTE OR CONTROVERSY BETWEEN THE COMPANY AND THE HOLDER WOULD BE BASED ON DIFFICULT AND COMPLEX ISSUES OF LAW AND FACT. ACCORDINGLY, THE COMPANY AND THE HOLDER HEREBY WAIVE TRIAL BY JURY IN ANY ACTION OR PROCEEDING THAT MAY BE COMMENCED BY OR AGAINST THE COMPANY ARISING OUT OF THIS NOTE.

13.     THE COMPANY AGREES THAT ALL OF ITS OBLIGATIONS UNDER THIS NOTE SHALL BE ABSOLUTE AND UNCONDITIONAL AND THE COMPANY HEREBY WAIVES ANY RIGHT TO ASSERT ANY SETOFF, COUNTERCLAIM OR CROSS-CLAIM.

14.     Any term of this Note may be amended or waived only by a written instrument executed by the Company and the Holder. No delay or failure on the part of the Holder in the exercise of any right or remedy shall operate as a waiver thereof, and no single or partial exercise by the Holder of any right or remedy shall preclude other or further exercise thereof or the exercise of any other right or remedy.

15.     The indebtedness evidenced by this Note is subordinated in right of payment to the prior payment in full of any Senior Indebtedness. "**Senior Indebtedness**" shall mean, unless expressly subordinated to or made on a parity with the amounts due under this Note, all amounts due in connection with (a) the Company's SBA line of credit with Access National Bank and (b) that certain Convertible Promissory Note issued by the Company to Hudson Bay Master Fund Ltd with principal amount of $3,000,000.00 and dated August 12, 2015.

16.     This Note may be transferred only upon its surrender to the Company for registration of transfer, duly endorsed, or accompanied by a duly executed written instrument of transfer in form satisfactory to the Company. Thereupon, this Note shall be reissued to, and registered in the name of, the transferee, or a new Note for like principal amount and interest shall be issued to, and registered in the name of, the transferee.  For purposes of clarification, other than the requirements set forth in the first sentence of this Section 17, the Holder may freely transfer or assign this Note to any of its Affiliates without the prior written consent of the Company or compliance with any other provision of this Note. Interest and principal shall be paid solely to the registered holder of this Note.  Such payment shall constitute full discharge of the Company's obligation to pay such interest and principal.

17.     This Note may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

18.     Any notice to be given under this Note shall be in writing, and shall be sent to the Holder or the Company, as the case may be, at the address set forth below each party's signature hereto and shall be deemed received: (a) on the earlier of the date of receipt or the date three (3) business days after deposit of such notice in the United States mail, if sent postage prepaid, certified mail, return receipt requested; (b) one (1) business day after deposit for delivery if sent for overnight delivery by a nationally recognized overnight courier; or (c) when actually received, if personally delivered.

19.     It is the desire and intent of the parties that the provisions of this Note be enforced to the fullest extent permissible under the law and public policies applied in each jurisdiction in which

enforcement is sought.  Accordingly, in the event that any provision of this Note would be held in any jurisdiction to be invalid, prohibited or unenforceable for any reason, such provision, as to such jurisdiction, shall be ineffective, without invalidating the remaining provisions of this Note. Notwithstanding the foregoing, if such provision could be more narrowly drawn so as not to be invalid, prohibited or unenforceable in such jurisdiction, it shall, as to such jurisdiction, be so narrowly drawn, without invalidating the remaining provisions of this Note.

20.     THE PARTIES ACKNOWLEDGE THAT THEY HAVE EXECUTED THIS NOTE WITH THE ADVICE OF COUNSEL AND WITH A FULL UNDERSTANDING OF THE LEGAL CONSEQUENCES OF THE PROVISIONS OF THIS NOTE.

********

IN WITNESS WHEREOF, the parties have executed this CONVERTIBLE PROMISSORY NOTE as of the date first set forth above.

CENTRIPETAL NETWORKS, INC.

By: _____
Name: Steven A. Rogers
Title: Chief Executive Officer

Address:       2251 Corporate Park Drive
               Herndon, VA 20171
               Attn: Chief Executive Officer

ACKNOWLEDGED AND AGREED:

**Millennium Trust Company, LLC, Custodian**

By: _____

Address: 2001 Spring Road, Suite 700
Oak Brook, IL 60523

**IN WITNESS WHEREOF,** the parties have executed this **CONVERTIBLE PROMISSORY NOTE** as of the date first set forth above.

**CENTRIPETAL NETWORKS, INC.**

By: _____

Name: Steven A. Rogers
Title: Chief Executive Officer

Address:       2251 Corporate Park Drive
                Herndon, VA 20171
                Attn: Chief Executive Officer

ACKNOWLEDGED AND AGREED:

**Millennium Trust Company, LLC, Custodian**

By: _____

Joanna Niemiec Manager.

Address: 2001 Spring Road, Suite 700
Oak Brook, IL 60523

# Exhibit B

THIS CONVERTIBLE PROMISSORY NOTE AND THE SECURITIES ISSUABLE UPON THE CONVERSION HEREOF HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR UNDER THE SECURITIES LAWS OF ANY STATES IN THE UNITED STATES. THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE ACT AND THE APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. THE ISSUER OF THESE SECURITIES MAY REQUIRE AN OPINION OF COUNSEL IN FORM AND SUBSTANCE SATISFACTORY TO THE ISSUER TO THE EFFECT THAT ANY PROPOSED TRANSFER OR RESALE IS IN COMPLIANCE WITH THE ACT AND ANY APPLICABLE STATE SECURITIES LAWS.

## CONVERTIBLE PROMISSORY NOTE

**$250,000.00**

**April 12, 2016**

For value received CENTRIPETAL NETWORKS, INC., a Delaware corporation ("*Payor*" or the "*Company*"), promises to pay to MILLENNIUM TRUST COMPANY, LLC, CUSTODIAN, FBO: ALBERT RICHARDS, ROTH IRA, 226 821 528 or its assigns ("*Holder*") the principal sum of Two Hundred Fifty Thousand Dollars (**$250,000**) plus simple interest on the outstanding principal amount at the rate of 5% per annum. Interest shall accrue on a day-to-day basis beginning on the date of issuance of this Convertible Promissory Note (this "*Note*") and continuing until the outstanding principal is paid or converted in full. Interest shall be computed on the basis of a year of 365 days for the actual number of days elapsed. All unpaid interest and principal shall be due and payable on the Maturity Date (as defined below), unless earlier converted as provided herein.

1.    All payments of interest and principal under this Note shall be in lawful money of the United States of America. All payments shall be applied first to any costs or expenses incurred by the Holder in connection with the enforcement and/or collection of this Note (pursuant to Section 8 below), second to accrued interest, and thereafter to principal.

2.    In no event shall the amount of interest due or payable under this Note exceed the maximum rate of interest allowed by applicable law and, in the event any such payment is inadvertently paid by the Company or inadvertently received by the Holder, then such excess sum shall be credited as a payment of principal. It is the express intent of the parties hereto that the Company not pay and the Holder not receive, directly or indirectly, in any manner whatsoever, interest in excess of that which may be lawfully paid by the Company under applicable law.

3.    At the closing of the next sale and issuance by the Company (the "*Next O3 Round*") of equity securities (the "*Future O3 Stock*") in which the Company receives gross proceeds of at least $5,000,000.00 from OPTION 3 CYBER INVESTMENTS, LLC and/or one of its Affiliates (as defined below) (including any principal and interest outstanding under this Note that converts into Future O3 Stock), this Note (and all amounts due hereunder, including the outstanding principal amount and all accrued but unpaid interest thereon (collectively, the "*Conversion Amount*")) shall be automatically converted into validly issued, fully paid and non-assessable shares of the Future O3 Stock. The number of shares of the Future O3 Stock issuable to the Holder upon the conversion of this Note in connection with the Next O3 Round, shall be equal to: (a) the then outstanding Conversion Amount; divided by (b) the lowest price per share of a share of the Future O3 Stock sold in the Next O3 Round. As used in this Note, the term "*Affiliate*" shall mean, with respect to any person or entity, any other person or entity

who, directly or indirectly, controls, is controlled by, or is in common control with such person or entity, including, without limitation, any general partner, manager, officer, director or equity owner now or hereafter existing that controls or is controlled by such person or entity.

4.     If the Company closes any sale and issuance of equity securities that do not constitute a Next O3 Round (each a "*Next Non-O3 Round*"), the Holder, at its option as evidenced by a written notice delivered to the Company, may elect to convert this Note (and all then outstanding Conversion Amount) into validly issued, fully paid and non-assessable shares of the securities issued in the Next Non-O3 Round (the "*Future Non-O3 Stock*"). The number of shares of the Future Non-O3 Stock issuable to the Holder upon the conversion of this Note in connection with a Next Non-O3 Round, shall be equal to: (a) the then outstanding Conversion Amount; divided by (b) the lowest price per share of a share of the Future Non-O3 Stock sold in the Next Non-O3 Round multiplied by 0.8. The Company agrees that it shall: (i) give written notice to the Holder at least 30 calendar days prior to the closing of any Next Non-O3 Round which notice shall include a summary of the material terms and conditions of the Next Non-O3 Round and copies of all of the transaction documents related to such Next Non-O3 Round; and (ii) provide the Holder with any revisions to the transaction documents related to such Next Non-O3 Round within one calendar day after such documents are prepared and/or received (as applicable).

5.     If the principal and interest outstanding under this Note converts into Future O3 Stock or Future Non-O3 Stock pursuant to the terms of Section 3 or 4 above: (a) the parties agree that no fractional shares shall be issued upon the conversion of this Note and in lieu of issuing any fractional shares, the Company shall pay to the Holder cash equal to such fraction multiplied by the price per share at which the Note converts; (b) as promptly as practicable after the date of conversion of this Note (but in no case later than ten (10) business days thereafter), the Company, at its expense, will issue and deliver to the Holder a certificate for the number of shares of Future O3 Stock or Future Non-O3 Stock issuable upon conversion of this Note; and (c) the Company shall pay any and all issue and other taxes that may be payable in respect of any issuance or delivery of shares of Future O3 Stock or Future Non-O3 Stock on conversion of this Note pursuant hereto. Upon conversion and delivery of the certificate evidencing the Future O3 Stock or Future Non-O3 Stock: (i) this Note shall become fully paid and satisfied; and (ii) the Holder shall surrender this Note, duly endorsed as "Paid in Full", to the Company.

6.     Notwithstanding the above, if a Change of Control (as defined below) is consummated prior the earlier of: (a) the Maturity Date; or (b) a conversion of this Note pursuant to the terms of Sections 3 or 4 above, then the Company shall immediately upon such consummation of the Change of Control pay to the Holder a cash payment equal to two times the principal amount of the Note and any unpaid, accrued interest. After the receipt of such payment: (i) this Note shall become fully paid and satisfied; and (ii) the Holder shall promptly surrender this Note, duly endorsed as "Paid in Full", to the Company. For purposes of this Note, a "*Change of Control*" shall mean: (x) a consolidation or merger of the Company with or into any other corporation or other entity or person, or any other corporate reorganization, other than any such consolidation, merger or reorganization in which the shares of capital stock of the Company immediately prior to such consolidation, merger or reorganization, continue to represent a majority of the voting power of the surviving entity immediately after such consolidation, merger or reorganization; (y) any transaction or series of related transactions in which in excess of fifty percent (50%) of the Company's voting power is transferred; *provided* that a Change of Control shall not include any transaction or series of transactions principally for bona fide equity financing purposes in which cash is received by the Company or any successor or indebtedness of the Company is cancelled

or converted or a combination thereof; or (z) any sale, lease, transfer, exclusive license or other disposition of all or substantially all of the Company's assets.

7.     If the Company has not consummated a Next O3 Round, a Next Non-O3 Round into which this Note converts or a Change of Control on or before December 23, 2016 (the "*Maturity Date*"), then the Company shall pay to the Holder on the Maturity Date all amounts due hereunder, including, but not limited to, the outstanding principal amount and all accrued but unpaid interest thereon, by wire transfer in immediately available funds pursuant to wiring instructions provided by the Holder.

8.     In the event of any Event of Default (as defined below) hereunder, Payor shall pay all costs and expenses (including, but not limited to, court costs and reasonable attorneys fees') incurred by the Holder in enforcing and collecting this Note.

9.     Payor may not prepay this Note without the prior written consent of the Holder.

10.    If there shall be any Event of Default hereunder, at the option and upon the declaration of the Holder of this Note and upon written notice to the Payor (which declaration and notice shall be deemed to have been automatic in the case of an Event of Default under Section 10(iii) or 10(iv)): (a) this Note shall accelerate and all principal and unpaid accrued interest then outstanding shall become due and payable; and (b) the Holder may exercise any and all rights and remedies available to it at law, in equity or otherwise. The occurrence of any one or more of the following shall constitute an "**Event of Default**":

(i)     Payor fails to pay timely any of the principal amount due under this Note on the date the same becomes due and payable or any accrued interest or other amounts due under this Note on the date the same becomes due and payable;

(ii)    Payor shall default in its performance of any covenant contained in this Note;

(iii)   Payor files any petition or action for relief under any bankruptcy, reorganization, insolvency or moratorium law or any other law for the relief of, or relating to, debtors, now or hereafter in effect, or makes any assignment for the benefit of creditors or takes any corporate action in furtherance of any of the foregoing; or

(iv)    An involuntary petition is filed against Payor (unless such petition is dismissed or discharged within sixty (60) calendar days under any bankruptcy statute now or hereafter in effect) or a custodian, receiver, trustee, assignee for the benefit of creditors (or other similar official) is appointed to take possession, custody or control of any property of Payor;

11.    Payor hereby waives demand, notice, presentment, protest, notice of protest and notice of dishonor of this Note.

12.    This Note shall be governed by and construed under the laws of the State of California, as applied to agreements among California State residents, without giving effect to conflicts of laws principles of any jurisdiction that would result in the laws of any other jurisdiction applying to this Note. THE COMPANY AND THE HOLDER HEREBY AGREE THAT ANY CLAIMS OR DISPUTES BETWEEN THE COMPANY AND THE HOLDER PERTAINING DIRECTLY OR INDIRECTLY TO THIS NOTE SHALL BE BROUGHT IN A FEDERAL COURT IN THE STATE OF CALIFORNIA, OR ANY STATE COURT LOCATED IN THE STATE OF CALIFORNIA AND THAT SUCH COURT SHALL HAVE JURISDICTION TO HEAR AND DETERMINE ANY SUCH CLAIMS.  THE

COMPANY AND THE HOLDER EXPRESSLY SUBMIT AND CONSENT IN ADVANCE TO SUCH JURISDICTION IN ANY ACTION OR PROCEEDING COMMENCED IN SUCH COURTS. FURTHER, THE COMPANY AND THE HOLDER HEREBY WAIVE THE RIGHT TO ASSERT THE DEFENSE OF FORUM NON CONVENIENS AND THE RIGHT TO CHALLENGE THE VENUE OF ANY COURT PROCEEDING. THE COMPANY AND THE HOLDER EACH ACKNOWLEDGE THAT ANY DISPUTE OR CONTROVERSY BETWEEN THE COMPANY AND THE HOLDER WOULD BE BASED ON DIFFICULT AND COMPLEX ISSUES OF LAW AND FACT. ACCORDINGLY, THE COMPANY AND THE HOLDER HEREBY WAIVE TRIAL BY JURY IN ANY ACTION OR PROCEEDING THAT MAY BE COMMENCED BY OR AGAINST THE COMPANY ARISING OUT OF THIS NOTE.

13.     THE COMPANY AGREES THAT ALL OF ITS OBLIGATIONS UNDER THIS NOTE SHALL BE ABSOLUTE AND UNCONDITIONAL AND THE COMPANY HEREBY WAIVES ANY RIGHT TO ASSERT ANY SETOFF, COUNTERCLAIM OR CROSS-CLAIM.

14.     Any term of this Note may be amended or waived only by a written instrument executed by the Company and the Holder. No delay or failure on the part of the Holder in the exercise of any right or remedy shall operate as a waiver thereof, and no single or partial exercise by the Holder of any right or remedy shall preclude other or further exercise thereof or the exercise of any other right or remedy.

15.     The indebtedness evidenced by this Note is subordinated in right of payment to the prior payment in full of any Senior Indebtedness. "**Senior Indebtedness**" shall mean, unless expressly subordinated to or made on a parity with the amounts due under this Note, all amounts due in connection with (a) the Company's SBA line of credit with Access National Bank and (b) that certain Convertible Promissory Note issued by the Company to Hudson Bay Master Fund Ltd with principal amount of $3,000,000.00 and dated August 12, 2015.

16.     This Note may be transferred only upon its surrender to the Company for registration of transfer, duly endorsed, or accompanied by a duly executed written instrument of transfer in form satisfactory to the Company. Thereupon, this Note shall be reissued to, and registered in the name of, the transferee, or a new Note for like principal amount and interest shall be issued to, and registered in the name of, the transferee. For purposes of clarification, other than the requirements set forth in the first sentence of this Section 17, the Holder may freely transfer or assign this Note to any of its Affiliates without the prior written consent of the Company or compliance with any other provision of this Note. Interest and principal shall be paid solely to the registered holder of this Note. Such payment shall constitute full discharge of the Company's obligation to pay such interest and principal.

17.     This Note may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

18.     Any notice to be given under this Note shall be in writing, and shall be sent to the Holder or the Company, as the case may be, at the address set forth below each party's signature hereto and shall be deemed received: (a) on the earlier of the date of receipt or the date three (3) business days after deposit of such notice in the United States mail, if sent postage prepaid, certified mail, return receipt requested; (b) one (1) business day after deposit for delivery if sent for overnight delivery by a nationally recognized overnight courier; or (c) when actually received, if personally delivered.

19.     It is the desire and intent of the parties that the provisions of this Note be enforced to the fullest extent permissible under the law and public policies applied in each jurisdiction in which

enforcement is sought. Accordingly, in the event that any provision of this Note would be held in any jurisdiction to be invalid, prohibited or unenforceable for any reason, such provision, as to such jurisdiction, shall be ineffective, without invalidating the remaining provisions of this Note. Notwithstanding the foregoing, if such provision could be more narrowly drawn so as not to be invalid, prohibited or unenforceable in such jurisdiction, it shall, as to such jurisdiction, be so narrowly drawn, without invalidating the remaining provisions of this Note.

20.     THE PARTIES ACKNOWLEDGE THAT THEY HAVE EXECUTED THIS NOTE WITH THE ADVICE OF COUNSEL AND WITH A FULL UNDERSTANDING OF THE LEGAL CONSEQUENCES OF THE PROVISIONS OF THIS NOTE.

*******

IN WITNESS WHEREOF, the parties have executed this CONVERTIBLE PROMISSORY NOTE as of the date first set forth above.

CENTRIPETAL NETWORKS, INC.

By: _Paul Barkworth_____
Name: Paul Barkworth
Title: Chief Financial Officer

Address:      2251 Corporate Park Drive
              Herndon, VA 20171
              Attn: Chief Executive Officer

ACKNOWLEDGED AND AGREED:

**Millennium Trust Company, LLC, Custodian**

By:_____

Address: 2001 Spring Road, Suite 700
Oak Brook, IL 60523

READ & AGREED

_Albert Richards_
ALBERT RICHARDS

---

Signature Page to Centripetal/ Millennium Trust Company, LLC, Custodian, Promissory Note

# Exhibit C

CENTRIPETAL NETWORKS, INC.
OMNIBUS AMENDMENT TO CONVERTIBLE PROMISSORY NOTES

This **OMNIBUS AMENDMENT TO CONVERTIBLE PROMISSORY NOTES** (this "*Amendment*") is made and entered into as of November 29, 2018, by and among **CENTRIPETAL NETWORKS, INC.**, a Delaware corporation (the "*Company*"), and **MILLENNIUM TRUST COMPANY, LLC, CUSTODIAN, FBO: ALBERT RICHARDS, ROTH IRA, 226 821 528**, the Note Holder.

### RECITALS

A.     The Company has entered into (i) that certain Convertible Promissory Note, dated December 23, 2015 in the principal amount of $250,000 and (ii) that certain Convertible Promissory Note, dated April 12, 2016 in the principal amount of $250,000.

B.     Section 14 of each Note provides that any term of this Note may be amended or waived only by a written instrument executed by the Company and the Holder.

C.     The undersigned Company and Note Holder, desire to amend the Notes as set forth below.

### AGREEMENT

In consideration of the foregoing recitals and the mutual promises, representations, warranties, and covenants set forth in this Amendment, and for other good and valuable consideration, the receipt and sufficiency of which are acknowledged, the parties to this Amendment agree as follows:

1.     Section 7 of the Note is deleted and replaced with the following:

"**7.**     If the Company has not consummated a Series B Round, into which this Note converts or a Change of Control on or before June 30, 2019 (the "Maturity Date"), then the Company shall pay to the Holder on the Maturity Date all amounts due hereunder, including, but not limited to, the outstanding principal amount and all accrued but unpaid interest thereon, by wire transfer in immediately available funds pursuant to wiring instructions provided by the Holder."

2.     **Continuing Effect**. Other than as set forth in this Amendment, all of the terms of the Note will continue in full force and effect.

3.     **Counterparts**.  This Amendment may be executed and delivered in two or more counterparts, including delivery by facsimile, pdf or other electronic counterparts, each of which will be deemed an original, but all of which together will constitute one and the same instrument.

**[SIGNATURE PAGES FOLLOW]**

IN WITNESS WHEREOF, the parties hereto have executed this OMNIBUS AMENDMENT TO CONVERTIBLE PROMISSORY NOTES as of the date first set forth above.

COMPANY:

CENTRIPETAL NETWORKS, INC.

By:_____

Steven Rogers
Chief Executive Officer

IN WITNESS WHEREOF, the parties hereto have executed this OMNIBUS AMENDMENT TO CONVERTIBLE PROMISSORY NOTES as of the date first set forth above.

**NOTE HOLDER:**

MILLENNIUM TRUST COMPANY, LLC, CUSTODIAN, FBO: ALBERT RICHARDS, ROTH IRA, 226 821 528

_____

**BENEFICARY**

ALBERT RICHARDS

# Exhibit D

**Albert Richards**

| | |
|---|---|
| **From:** | Albert Richards |
| **Sent:** | Thursday, October 3, 2019 9:31 AM |
| **To:** | Jonathan Rogers |
| **Cc:** | Paul Barkworth; Steven Rogers |
| **Subject:** | RE: Call / Update |

There's nothing to rep and warrant what other holders will do – it's just that you need to rep and warrant that none of the clauses in my notes have been triggered.

You initially had me doing that – but I can't because I don't have the information.

Albert Richards
Alambic Investment Management, LP
(office) 
(cell)

This communication, including any attachments, contains information from Alambic Investment Management, L.P., that may be confidential and is solely intended for the use of the addressee. If you are not the intended recipient, any disclosure, copy, distribution, or use of the contents of this communication is prohibited. If you have received the message in error, please advise the sender by reply e-mail and delete the message and any attachment(s) thereto without retaining any copies. Nothing contained in this email is intended to be an offer to buy or sell securities, or any shares or interests in any investment.

**From:** Jonathan Rogers <jrogers@centripetalnetworks.com>
**Sent:** Thursday, October 3, 2019 6:20 AM
**To:** Albert Richards <arichards@alambicim.com>
**Cc:** Paul Barkworth <pbarkworth@centripetalnetworks.com>; Steven Rogers <srogers@centripetalnetworks.com>
**Subject:** Re: Call / Update

Bert,

Im waiting on a full markup back from counsel, but a couple things we noticed. First is that we will have to clarify that you're waiving the equity options with respect to this note, but carveout for the fact that you separately hold shares from a different transaction. Second you've put in a requirement that we rep and warrant with respect to what other holders will do with respect to conversion. We can't do that and will have to strike that.

Thanks
Jonathan


-----------------------------------------------------------------
**Jonathan Rogers | Centripetal Networks, Inc.**
*VP Operations*

Office: ███████   Cell: ███████
jrogers@CentripetalNetworks.com


WE TURN INTELLIGENCE INTO ACTION

# Exhibit E

# NOTES CANCELLATION, WAIVER OF RIGHTS AND SETTLEMENT AGREEMENT

THIS NOTE CANCELLATION, WAIVER OF RIGHTS AND SETTLEMENT AGREEMENT (as the same may be amended, modified or supplemented from time to time, the "Agreement") is made and entered into this 17th day of October, 2019 (the "Execution Date"), by and between CENTRIPETAL NETWORKS, INC., a Delaware corporation ("Centripetal"); and MILLENNIUM TRUST COMPANY, LLC, CUSTODIAN, FBO: ALBERT RICHARDS, ROTH IRA, 226 821 528 ("Creditor").

## RECITALS

A.     Centripetal issued to Creditor that certain Convertible Promissory Note dated January 7, 2016 in the principal amount of Two Hundred Fifty Thousand and no/100 Dollars ($250,000.00)("Note 1") and that certain Convertible Promissory Note dated April 12, 2016 in the principal amount of Two Hundred Fifty Thousand and no/100 Dollars ($250,000.00)("Note 2")(with Note 1 and Note 2 referred to collectively herein as the "Notes") in exchange for monies advanced and loaned by Creditor in the principal amount of the Notes. The Notes provided, alternatively, for either i) payment of principal and accrued interest, or ii) conversion of the Notes into certain equity securities of Centripetal as identified therein. The Notes and all other loan documents executed in connection therewith are referred to hereinafter as the "Loan Documents."

B.     Notwithstanding the convertible features of the Notes, no event of conversion has occurred prior to the Execution Date, and Creditor has not obtained, by any rights of conversion, any interest in equity securities of Centripetal. Prior to any event of conversion, Creditor has demanded payment of all amounts due under the Notes, alleging, *inter alia*, that the Notes have matured and is fully due and payable.

C.     Centripetal and Creditor have agreed to resolve the demands for payment made by Creditor, the liabilities evidenced by the Notes, and, once the liabilities under the Notes have been settled and finalized under Section 3 below, to waive any existing or future rights of conversion or issuance of any additional equity securities of Centripetal evidenced in the Notes, and to otherwise settle all issues related to the rights, interests and liabilities evidenced under the Loan Documents, upon terms and conditions more particularly set forth herein.

## AGREEMENT

For and in consideration of these premises and the mutual promises and agreements of the parties set forth below and for other good and valuable consideration, the receipt and sufficiency of which are acknowledged, the parties agree as follows:

1.     Recitals. The recitals to this Agreement are hereby incorporated by reference.

2.     Amounts Due. Centripetal and Creditor acknowledge and stipulate that the Notes have matured, are due and payable, and further agree that the amounts due with respect to the Notes, including principal, interest, accrued fees and costs, and any other amounts due under the

1

Loan Documents (herein, collectively the "Indebtedness"), as of September 13, 2019, are accurately set forth in **Exhibit A** attached hereto.

3.    Provisions for Payment and Satisfaction of the Notes.  The parties have agreed that Centripetal shall make payment in full of all Indebtedness then outstanding and payable under the Notes within seven (7) days of the Execution Date of this Agreement in full and final satisfaction and cancellation of the Notes as set forth hereinbelow.

4.    Cancellation and Return of Notes. Upon the completion of payment of the Indebtedness, as provided for in Section 3 herein, the Notes shall be deemed satisfied, and Creditor shall mark the Notes as "Paid in Full" and shall return the original Notes to Centripetal with such legend endorsed by Creditor. Thereafter, the Notes shall be deemed fully paid and cancelled, and Centripetal shall be deemed to have been released by Creditor of any and all remaining obligations thereunder.

5.    Waiver of Rights of Conversion and of First Offer.

a.    Centripetal expressly acknowledges and warrants that, as of the Execution date, i) no event of conversion under Clause 3 of the Notes (relating to "Future O3 Stock") has occurred, ii) no equity securities have been issued that would give rise to the Creditor's option to convert (a "Next Non-O3 Round") under Clause 4 of the Notes, iii) no notices are currently due the Creditor under Clause 4 of the Notes (also relating to a "Next Non-O3 Round"), and iv) no Change of Control (as defined in the Notes) has occurred per Clause 6 of the Notes. Creditor acknowledges and agrees that the issuance by Centripetal of common options and/or warrants do not constitute a Next Non-O3 Round and the issuance of any such options or warrants does not trigger any right or entitlement to conversion provided for in the Notes.

b.    Creditor expressly acknowledges and agrees, based on Centripetal's warranties in 5(a) above, that no event of conversion has occurred under the Notes as of the Execution Date, and Creditor has not received any issuance of equity securities of Centripetal in connection therewith. Upon receipt of full payment of the Notes, as provided herein, Creditor affirmatively waives, releases and relinquishes any rights of, or provisions for, conversion as provided for or referenced under the Notes or any of the Loan Documents, and further agrees that it shall not have any further right under the Notes and/or any other Loan Document executed in connection therewith to acquire any additional equity securities of Centripetal.

c.    In addition to the waivers made hereinabove, and upon receipt of full payment of the Notes as provided herein, Creditor affirmatively waives, releases and relinquishes any and all other rights specifically granted by the Notes or the Loan Documents to acquire any additional equity security interest of Centripetal.  No rights are relinquished prior to receipt of full payment.  Nothing in this Agreement shall be interpreted to affect any rights of Creditor in relation to any other investments (*e.g.,* preferred share ownership) held in Centripetal.

6.    Modification/No Novation. Nothing herein contained shall be construed as a substitution or a novation of the original Indebtedness evidenced by the Notes or any of the other Loan Documents.  Nothing herein contained shall be construed to modify any other agreement or

2

the terms of any other investment by Creditor in Centripetal, including any preferred share holdings.

7.     Forbearance of Creditor.  Provided that Centripetal is not in default of its obligations under this Agreement, Creditor agrees to forbear from pursuing or instituting any of its remedies, legal or equitable, against Centripetal in connection with the Notes , the Indebtedness evidenced thereby, or any other Loan Documents related thereto. This agreement to forbear shall immediately terminate without notice upon a default in payment of the Indebtedness by Centripetal under the express terms and conditions of this Agreement.

8.     Representations and Warranties of the Parties.  To induce each other to enter into this Agreement and to provide the agreements and accommodations described herein, each of Centripetal and Creditor make the following representations and warranties set forth below which are true as of the Execution Date, and do acknowledge each party's justifiable right to rely upon these representations and warranties:

a.     Title and Ownership of the Notes.  Creditor expressly represents and warrants that it is the sole owner and the holder of the Notes as of the Execution Date hereof, that the Notes have not been previously assigned, either absolutely or as collateral security, and that the Notes are otherwise free and clear of any claims, liens, pledges, restrictions, charges and encumbrances of any kind.

b.     Corporate Authority.  Each of Centripetal and Creditor represent and warrant that each of them possesses all requisite legal right, power, authority and capacity to execute, deliver and perform this Agreement and each other agreement, instrument and document to be executed and delivered by or on behalf of either party in consummation of the transactions contemplated herein. Each of Centripetal and Creditor represents and warrants to the other that this Agreement is binding upon them and their successors and assigns and is enforceable against each of them and their successors and assigns in accordance with its terms.

c.     No Conflicts.  Each of Centripetal and Creditor represent and warrant to the other that neither the execution and delivery nor the performance of this Agreement conflicts with, violates, or results in any breach, or constitutes a default or causes an acceleration of (a) any judgment, decree, order, statute, rule or regulation applicable to either party, (b) any provision of either party's Articles of Incorporation or partnership agreement(s), or (c) any agreement to which either party or its affiliates is a party or by which any of its or their property is bound.

9.   Miscellaneous.

a.     Cooperation.  As an express provision of the agreements made herein, the parties agree to cooperate fully, promptly and in good faith with each other in connection with the consummation of the terms and intent of this Agreement, including executing any and all documents and taking any and all additional actions reasonably required to carry out the terms and intent hereof.

3

b.      Costs of Transaction.  Except as otherwise expressly provided herein, the parties shall pay their own expenses associated with the preparation (and negotiation) of this Agreement, as well as its implementation.

c.      Confidentiality.   The parties hereto shall keep the terms and conditions of this Agreement confidential.  It shall be deemed to be a default hereunder if any of the terms and conditions of this Agreement are divulged by any party. Notwithstanding the foregoing, the parties may disclose the terms and conditions of this Agreement to their existing or proposed: counsel; accountants; tax advisors; investors; shareholders; partners; bonding companies; purchasers; lenders; regulatory authorities; to any other Purchaser as that term is defined under the Loan Documents; or to other persons to whom disclosure is or may be required pursuant to any regulation or requirement governing business operations of any of the parties hereto.

d.      Notices. All notices, requests, demands and other communications provided for in this Agreement will be in writing and shall be delivered by hand, sent prepaid by Federal Express (or a comparable overnight delivery service), or sent via email (with confirmation receipt), to the parties at their respective addresses set forth on the signature page of this Agreement or at such other address as may be designated by such party from time to time in a writing forwarded in a like manner. Any notice, demand or other communication delivered or sent in the foregoing manner shall be deemed given or made (as the case may be) upon the earliest of 1) the date it is actually received, 2) the business day after the day on which it is delivered by hand, 3) the business day after the day on which it is delivered to Federal Express for delivery (or a comparable overnight delivery service), or 4) day email confirmation receipt has been received from the recipient(s) by the sender.

e.      Successors and Assigns. This Agreement will be binding upon and inure to the benefit of each of Centripetal and Creditor, and their respective successors, assigns, heirs, personal representatives, executors and administrators.

f.      This Agreement represent the entire agreement concerning the Notes and Loan Documents between the parties relating to the matters contained herein, supersedes all prior commitments relating to the substance hereof, and may be modified only by an agreement in writing.

g.      Should any provision of this Agreement be illegal or unenforceable for any reason, the remainder of this Agreement shall not be affected and shall be interpreted without regard to the illegal or unenforceable provision.

h.      This Agreement may be executed in counterparts, each of which shall constitute an original.  Electronic and/or facsimile signatures shall be sufficient to bind the parties, and shall be as valid and binding as an original.

i.      This Agreement will be governed by the laws of the Commonwealth of Virginia, without reference to conflict of laws principles.

4

j.      The parties acknowledge and agree that this Agreement is the product of negotiation between the parties and that neither party shall be deemed to have drafted its terms and provisions and that, accordingly, the terms of this Agreement shall not be construed more strictly against one party or the other.

[Signatures on following pages.]

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed as of the day and year first above written.

CENTRIPETAL NETWORKS, INC.

By:_____[SEAL]
Print Name:   Jonathan Rogers
Its: _____COO_____

Address for Notices:

Centripetal Networks, Inc.
Attn: Jonathan Rogers
2251 Corporate Park Dr
   Herndon VA 20171

Email: jrogers@centripetalnetworks.com

With copy to:  Kevin M. O'Donnell., Esq.
               Henry & O'Donnell, P.C.
               300 N. Washington Street, Suite 204
               Alexandria, Virginia  22314

               Email: kmo@henrylaw.com

6

CREDITOR:

MILLENNIUM TRUST COMPANY, LLC,
CUSTODIAN, FBO: ALBERT RICHARDS,
ROTH IRA, 226 821 528

By: _____ [SEAL]
Print Name: _ELIJAH RAAAKOVICH_
Its: _SUPERVISOR - ALTERNATIVE OPERATIONS_

Address for Notices: Millennium Trust Company LLC
ATTN: Alternatives Dept.
2001 Spring Rd, Suite 700
E-mail: Ips@mtrustcompany.com
OakBrook, IL 60523

BENEFICIARY:

Albert Richards

By: _____

Print Name: _ALBERT RICHARDS_

Address for Notices:

Albert Richards
266 Beach Road
Belvedere, CA  94920

E-mail: ████████████

7

## EXHIBIT A

### Notes #1 and #2

As of:  September 13th, 2019

| | |
|---|---|
| Principal | $500,000.00 |
| Accrued Interest | $  88,801.36 |
| **Total Payoff** | **$588,801.36** |

per diem of $68.49

8

# Exhibit F

**albert** 

| | |
|---|---|
| **From:** | Albert Richards <arichards@alambicim.com> |
| **Sent:** | Friday, November 6, 2020 1:49 PM |
| **To:** | albert |
| **Subject:** | Centripetal |

Is a warrant an equity security?

https://www.lawinsider.com/dictionary/equity-security

Albert Richards
CEO/Founder
Alambic Investment Management, L.P.

(office)
(cell)



900 Larkspur Landing Circle, Suite 230 • Larkspur
California, U.S.A. 94939

This communication, including any attachments, contains information from Alambic Investment Management, L.P., that may be confidential and is solely intended for the use of the addressee. If you are not the intended recipient, any disclosure, copy, distribution, or use of the contents of this communication is prohibited. This message and related attachments are intended to be an informal means of communication and should not be relied upon, other than for discussion purposes.  It does not constitute an offer to sell, or a solicitation of an offer to buy or sell, any securities.  Any offer to purchase or sell any securities or invest in any product will be made only by means of a formal Private Placement Memorandum or other offering document and, as applicable, a related subscription agreement to be furnished to prospective investors.  Neither the Funds nor Alambic provide any assurance or guarantee that investments in any Client accounts it manages will operate in a manner consistent with these materials.  **Past performance is not an indication of future results.**  Any material contained herein is intended for distribution only to "accredited investors," as defined in Regulation D of the Securities Act of 1933, and "qualified purchasers," as defined in the Investment Company Act of 1940.