UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALBERT RICHARDS,<br><br>    Plaintiff,<br><br>v.<br><br>CENTRIPETAL NETWORKS, INC., et al.,<br><br>    Defendants. | Case No. 23-cv-00145-HSG<br><br>**ORDER DENYING MOTION FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. No. 126 |

Pending before the Court is a motion for summary judgment filed by Defendants Centripetal Networks LLC, Steven Rogers, and Jonathan Rogers. Dkt. No. 126. The Court finds these matters appropriate for disposition without oral argument and the matters are deemed submitted. *See* Civil L.R. 7-1(b). For the reasons detailed below, the Court **DENIES** the motion for summary judgment.

**I.   BACKGROUND**

The parties are familiar with the facts of this case, and the Court includes them here only as relevant to the pending motion. The following facts are based on the evidence viewed in the light most favorable to Plaintiff as the non-moving party.[1] *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (on a motion for summary judgment, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in [her] favor").

---

[1] To the extent that Plaintiff filed separate evidentiary objections, Dkt. No. 128-3, this was improper. Under the Local Rules, "[a]ny evidentiary and procedural objections to the motion must be contained within the brief or memorandum." *See* Civil L.R. 7-3(a). The Court therefore **STRIKES** Dkt. No. 128-3 from the docket. The Court cautions Plaintiff that moving forward, the Court expects him to fully comply with the Local Rules.

### A.     Factual Background

In 2015 and 2016 Plaintiff Albert Richards purchased two Convertible Promissory Notes (the "Notes") in the amount of $250,000 each from Defendant Centripetal Networks, Inc. *See* Dkt. No. 126-4, Ex. B; Dkt. No. 126-5, Ex. C. The terms and conditions of the Notes are identical. *Id.* At the time Plaintiff purchased them, Centripetal was considering a "Series B round" of investments led by a venture firm called Option 3 Cyber Investments, LLC or "O3." *See* Dkt. No. 126-7, Ex. E. The Notes would automatically convert into Centripetal stock in the event of the closing of the sale and issuance of equity securities to O3 in excess of $5 million ("Next O3 Round"). *See* Dkt. No. 126-4, Ex. B at ¶ 3; Dkt. No. 126-5, Ex. C at ¶ 3. The Notes also gave Plaintiff the option to convert his Notes at a discounted price in the event of any other "sale and issuance of equity securities" that did not involve O3 ("Next Non-O3 Round"). *See id.* Specifically, the Notes stated:

> If the Company closes *any sale and issuance of equity securities* that do not constitute a Next O3 Round (each a "Next Non-O3 Round"), the Holder, at its option as evidenced by a written notice delivered to the Company, may elect to convert this Note (and all then outstanding Conversion Amount) into validly issued, fully paid and non-assessable shares of the securities issued in the Next Non-O3 Round (the "Future Non-O3 Stock").

*Id.* at ¶ 4 (emphasis added).

Under the Notes, Centripetal had to provide Plaintiff with written notice of any such triggering event:

> The Company agrees that it shall: (i) *give written notice to the Holder at least 30 calendar days prior to the closing of any Next Non-O3 Round* which notice shall include a summary of the material terms and conditions of the Next Non-O3 Round and copies of all of the transaction documents related to such Next Non-O3 Round; and (ii) provide the Holder with any revisions to the transaction documents related to such Next Non-O3 Round within one calendar day after such documents are prepared and/or received (as applicable).

*See id.* (emphasis added). If neither a "Next O3 Round" nor a "Next Non-O3 Round" occurred by the Notes' maturity dates, then Centripetal was required to repay Plaintiff his principal and

accrued but unpaid interest. *See* Dkt. No. 126-4, Ex. B at ¶ 7; Dkt. No. 126-5, Ex. C at ¶ 7.

However, according to Plaintiff, from 2016 through 2019, Centripetal sold and issued various types of "equity securities" without providing Plaintiff with the required notice. *See* Dkt. No. 53 ("SAC") at ¶ 30. Plaintiff asserts that these included:

- Stock Option Exercises: Centripetal issued tens of thousands of common stock shares based on the exercise of employee stock options between December 2015 and December 2018. *See* Dkt. No. 128-1 ("Hejinian Decl.") at ¶ 2, & Ex. 41 at 2.

- Convertible Notes: Centripetal issued a $250,000 convertible note to investor Cristobal Conde in April 2016 with similar terms to the Notes at issue here. *See* Dkt. No. 128-1, Ex. 25. And on 12 occasions in 2017 and 2018 Centripetal also issued convertible notes with warrants attached to investor Douglas A. Smith. *See* Hejinian Decl. at ¶ 3, & Exs. 26, 42–76.

- Stock Option Issuances: Centripetal issued multiple employee stock options between 2016 and 2018. *See* Hejinian Decl. at ¶ 4, & Ex. 41 at 6–11.

- O3 Notes Conversion: Centripetal converted O3's convertible notes into series A-2 preferred shares on October 18, 2019. *See* Hejinian Decl., Exs. 39–40.

Defendants do not appear to dispute that these events occurred, but respond that they do not constitute triggering events as contemplated under the terms of the Notes, and that Plaintiff had notice of them anyway. *See generally* Dkt. No. 126; Dkt. No. 133.

In August 2019, after the Notes' maturity date had already passed, Plaintiff emailed Defendant Steven Rogers, Centripetal's founder and majority shareholder, to redeem his Notes. *See* Dkt. No. 126, Ex. G. During the email exchange, Plaintiff explained:

3

> I think you're doing a fantastic job in the face of some pretty strong obstacles, but I really need to reduce my risk given a number of personal things as well as general worries about the economy.

*See id.* at 2. The parties therefore negotiated a document entitled "Notes Cancellation, Waiver of Rights and Settlement Agreement" (the "Settlement Agreement"). *See, e.g.*, Dkt. No. 128-1 ("Hejinian Decl."), Exs. 28–35. In the course of these negotiations, Defendant Jonathan Rogers mentioned that he had "been preoccupied along with our counsel on the closing we're working through." *See* Hejinian Decl., Ex. 27.[2] In response, Plaintiff asked if Defendants were "negotiating an equity raise at the moment." *See id.* Paul Barkworth, the company's Chief Financial Officer, stated that "[n]o, this is not an equity financing" and that "Centripetal is not negotiating an equity financing with another party at present." *Id.*

Jonathan Rogers nevertheless explained to Plaintiff:

> [T]o be clear we are not trying to keep you from electing to convert despite the fact that it hasn't been triggered. This is your affirmative election to redeem. We can likely rep on the absence of the triggering event.

*See* Hejinian Decl., Ex. 30. Mr. Rogers also later said it was "[t]oo bad we can't twist your arm to convert . . . ." *See* Hejinian Decl., Ex. 31. When Plaintiff said "I actually can't convert, as there isn't any transaction to base a convert off of," Mr. Rogers responded that it "can electively be negotiated if you want." *See id.* Despite this invitation, the parties continued to revise the Settlement Agreement and executed it on October 17, 2019. *See* Dkt. No. 126-10, Ex. H. Centripetal paid Plaintiff the balance on the Notes and Plaintiff relinquished his conversion rights. *See* Hejinian Decl., Ex. 36.

The Settlement Agreement states in relevant part:

> Centripetal expressly acknowledges and warrants that, as of the Execution date . . . no equity securities have been issued that would give rise to the Creditor's option to convert (a 'Next Non-O3 Round")

---

[2] Jonathan Rogers is Steven Rogers's son and the Chief Operating Officer of Centripetal. *See* SAC at ¶ 4. From May 2010 to July 2015 Jonathan Rogers was the company's Chief Financial Officer, and from July 2015 to June 2017 he was the Vice President of Operations. *Id.*

4

under Clause 4 of the Notes . . . .

*See* Dkt. No. 126-10, Ex. H at § 5(a). In the same paragraph the Settlement Agreement also provides that Plaintiff "acknowledges and agrees that the issuance by Centripetal of common options and/or warrants do not constitute a Next Non-03 Round and the issuance of any such options or warrants does not trigger any right or entitlement to conversion provided for in the Notes." *Id.*

Plaintiff claims that he was unaware of this specific addition to the Settlement Agreement. *See* Dkt. No. 128-2 ("Richards Decl.") at ¶¶ 28–31. Plaintiff had asked Defendants to accept his changes and highlight any new changes to the draft agreement. *See* Hejinian Decl., Ex. 32. In response, Defendants sent a revised draft of the five-page agreement with both Plaintiff's and Defendants' proposed changes in redline. *See* Hejinian Decl., Ex. 34. In the body of the email Jonathan Rogers stated that he "got the attached revs from counsel," and that they "accommodated the other changes you requested." *See* Hejinian Decl., Ex. 35. Plaintiff apparently interpreted this to mean that Centripetal had not made any of its own changes. *See* Hejinian Decl., Ex. 4 at 197:8–198:4, 199:16–23. Plaintiff therefore did not forward this final version to his lawyers to review before signing it. *See id.*

Plaintiff later stated that he regretted signing the Settlement Agreement. *See* Hejinian Decl., Ex. 4 at 88:11–18. In October 2020, Centripetal won a patent judgment against Cisco Systems potentially worth over $2 billion. *See Centripetal Networks, Inc. v. Cisco Sys. Inc.*, 492 F. Supp. 3d 495 (E.D. Va. 2020), *vacated and remanded by Centripetal Networks, Inc. v. Cisco Sys., Inc.*, 38 F.4th 1025 (Fed. Cir. 2022).[3] Plaintiff then emailed Steven and Jonathan Rogers that "[o]f course, I now wish I had held onto the Convert [Notes], but that was my decision and the structure wasn't right anyway, as it converted at the 'next share issue price,' and there hasn't been one (right?)." *See* Dkt. No. 126-12, Ex. J.

Around this same time, Plaintiff suspected that Defendants had failed to provide him

---

[3] On retrial following the Federal Circuit remand, Cisco completely prevailed. *See Centripetal Networks, LLC v. Cisco Sys., Inc.*, 705 F. Supp. 3d 537 (E.D. Va. 2023). A subsequent appeal is still pending.

5

1  notice of multiple triggering events under the Notes. *See* Richards Decl. at ¶¶ 35–64. Plaintiff
2  looked back at prior financial statements and investor disclosures and discovered several events
3  that he believes required notice. *Id.* He asserts that he was only aware of "a few" of these alleged
4  triggering events prior to starting his investigation in November 2020. *See id.* at ¶¶ 59–64.
5  Because Defendants had warranted during the Settlement Agreement negotiations and in the
6  agreement itself that no triggering events had occurred, Plaintiff claims that Defendants
7  fraudulently induced him into signing the Settlement Agreement. *See id.* at ¶ 47.

### B. Procedural Background

Plaintiff initially filed this case in January 2023. *See id.* Plaintiff filed an amended complaint, Dkt. No. 26-1, which Defendants moved to dismiss, Dkt. No. 35. In January 2024, the Court granted in part and denied in part the motion. Dkt. No. 50 ("First MTD Order"). The Court concluded that the Settlement Agreement barred some, but not all of Plaintiff's claims. *See id.* As relevant here, the Court reasoned that the Settlement Agreement barred the breach of contract claims relating to the issuance of common options and warrants. *Id.* at 4–7. However, the Court explained that it could not determine at the motion to dismiss stage whether the Settlement Agreement also barred claims relating to the issuance of shares after the *exercise of stock options* because the Settlement Agreement was "susceptible to multiple interpretations" as to that issue. *See id.* at 6. The Court therefore allowed Plaintiff's breach of contract claim, fraudulent inducement, negligent misrepresentation, and fraud claims to move forward on this narrower basis. *Id.* at 5–10. The Court also denied the motion to dismiss as to the claims arising under California Corporation Code Sections 25401 and 25403, but dismissed Plaintiff's other claims. *Id.* at 5–12.

Plaintiff filed the second amended complaint, alleging virtually the same claims. *See* SAC. The Court again granted in part and denied in part Defendants' motion to dismiss. *See* Dkt. No. 79 ("Second MTD Order"). The Court did not repeat its analysis from the First MTD Order. Instead, the Court rejected Defendants' argument that Plaintiff's claims were untimely and that California Corporations Code § 25017 precluded Plaintiff's breach of contract claim. *See id.* at 7–10. The Court also concluded that Plaintiff had adequately alleged "that his rights were triggered

6

when Centripetal issued shares of stock upon the exercise of stock options by their holder, and that Defendants obscured this fact in their reports and communications with the intent to defraud Plaintiff to deny him the benefit of his investment." *See id.* at 13. Plaintiff's remaining causes of action in this case accordingly include a claim for breach of contract and four fraud-based claims related to the Settlement Agreement—concealment; negligent misrepresentation; fraud – intentional misrepresentation; and fraudulent inducement. *See* SAC at ¶¶ 238–279.

Defendants now move for summary judgment. Dkt. No. 126.

## II. LEGAL STANDARD

Summary judgment is proper when a "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And a dispute is "genuine" if there is evidence in the record sufficient for a reasonable trier of fact to decide in favor of the nonmoving party. *Id.* But in deciding if a dispute is genuine, the court must view the inferences reasonably drawn from the materials in the record in the light most favorable to the nonmoving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986), and "may not weigh the evidence or make credibility determinations," *Freeman v. Arpaio*, 125 F.3d 732, 735 (9th Cir. 1997), *overruled on other grounds by Shakur v. Schriro*, 514 F.3d 878, 884–85 (9th Cir. 2008).

The moving party bears the initial burden of identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The burden then shifts to the nonmoving party to "go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *See id.* at 324 (quoting Fed. R. Civ. P. 56(e) (amended 2010)). The nonmoving party must show more than "the mere existence of a scintilla of evidence." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) (citing *Liberty Lobby*, 477 U.S. at 252). "In fact, the non-moving party must come forth with evidence from which a jury could reasonably render a verdict in the non-moving party's favor." *Id.* (citing *Liberty Lobby*, 477 U.S. at 252). If the nonmoving party fails to make

7

1  this showing, "the moving party is entitled to judgment as a matter of law." *Celotex Corp.*, 477

2  U.S. at 323.  If a court finds that there is no genuine dispute of material fact as to only a single

3  claim or defense or as to part of a claim or defense, it may enter partial summary judgment.  Fed.

4  R. Civ. P. 56(a).

### III.   DISCUSSION

Plaintiff contends that if his fraud claims are meritorious, then the Settlement Agreement is voidable and can be rescinded, and does not bar his breach of contract claim as to any of the alleged triggering events.  *See, e.g.*, Dkt. No. 128 at 12–15.  Plaintiff's claims, however, involve considerable overlap with each other.  Plaintiff can only succeed on his fraud-based claims, and rescind the Settlement Agreement, if there was a triggering event under the terms of the Notes that Defendants misrepresented, concealed, or failed to disclose.  And similarly, Plaintiff can only succeed on his breach of contract claim if there was such a triggering event as to which Defendants failed to provide written notice.  Plaintiff's claims thus rise or fall based on what constitutes a triggering event under the Notes.  Specifically, the parties dispute the meaning of "*any sale and issuance of equity securities* that do not constitute a Next O3 Round."  *See* Dkt. No. 126-4, Ex. B at ¶ 4 (emphasis added); Dkt. No. 126-5, Ex. C at ¶ 4 (emphasis added).

#### A.   Scope of Triggering Events

As an initial matter, Defendants urge that the Court's prior orders on the motions to dismiss limited the scope of the possible triggering events under the Notes.  *See* Dkt. No. 126 at 12–14.  In the order on the first motion, the Court held that "the Settlement Agreement operates to bar the breach of contract claims relating to the issuance of common options and warrants."  *See* First MTD Order at 5–6.  The Court further clarified that the Settlement Agreement barred "the various types of warrants at issue" here.  *See id.* at 6–7.  However, the Court held that the issuance of stock upon the *exercise* of stock options was not barred by the settlement agreement.  *See id.* at 5–6.  The Court did not explicitly revisit this holding in its order on the second round motion to dismiss.  *See generally* Second MTD Order.  But the Court denied Defendants' motion to dismiss the breach of contract claim.  *Id.*

Now, on summary judgment, Defendants contend that "the Court has already ruled as a

matter of law that Mr. Richards cannot pursue contract or fraud claims based on Centripetal's issuance of warrants or stock options." *See* Dkt. No. 126 at 2. Plaintiff, on the other hand, urges that if, as he contends, he was fraudulently induced into entering into the Settlement Agreement, then the agreement is voidable and can be rescinded. *See* Dkt. No. 128 at 14–15 (citing *Rosenthal v. Great W. Fin. Sec. Corp.*, 14 Cal. 4th 394, 415 (1996)). The Settlement Agreement, therefore, would not operate to limit Plaintiff—or his claims—in any way. *Id.* In particular, Plaintiff argues that he would not be bound by his own representation in the Settlement Agreement that the "issuance . . . of common options and/or warrants do not constitute" a triggering event. *See id.* at 15 (citing Hejinian Decl., Ex. 36 at § 5(a)). The Court finds it surprising (and inefficient) that the parties did not raise any questions about the remaining scope of Plaintiff's breach of contract claim before now, which has resulted in an ongoing muddiness in nailing down what is now at issue. In particular, part of the challenge is that Plaintiff's theories appear to have shifted over time.

<u>Stock Option Issuances.</u> Plaintiff has repeatedly disavowed that the *issuance* of stock options constitutes a triggering event under the Notes. In his opposition to the first motion to dismiss, Plaintiff stated explicitly that he "does not allege that Centripetal's 'issuance of options' gave him a right to convert." *See* Dkt. No. 41 at 2. Rather, he explained that his theory was that "the sale and issuance of common stock upon option *exercises*—a completely different event from option *issuance*" triggered his conversion rights. *See id.* (emphasis in original); *see also id.* at 14. In the SAC, Plaintiff similarly acknowledged that "Centripetal issued a significant number of options" over the relevant time period. *See* SAC at ¶ 30, n.10. However, Plaintiff stated that "to the best of Plaintiff's knowledge, these options were all associated with grants to management and employees, meaning *they were not within the 'sale' portion of the 'sale and issuance' clause in the Notes*."[4] *Id.* (emphasis added). In short, Plaintiff has consistently stated that the issuance of options is not a triggering event under the Notes.

---

[4] In his declaration in opposition to the motion for summary judgment, Plaintiff has even acknowledged that "[w]hile my notes were active, I assumed that Centripetal issued stock options to management and employees." *See* Richards Decl. at ¶ 63.

But now, Plaintiff appears to resuscitate the argument that the issuance of stock options to employees constitutes a triggering event under the Notes. *See* Hejinian Decl. at ¶ 4, & Ex. 41 at 6–11; *see also* Dkt. No. 128 at 4–5, 14–15, & n.6. In his opposition to the motion for summary judgment, for example, Plaintiff points out that "Defendants issued thousands of employee stock options in three separate tranches, each a triggering event." *See* Dkt. No. 128 at 14. He contends that "[a]s with the other triggering events, Defendants never provided him with written notice of these transactions as required by the Notes." *Id.* at 5. Plaintiff has offered no justification for—or legal authority permitting—this flip-flopping, and the Court will not permit him to base his breach of contract claim on a theory that he has previously disavowed. *See Am. Title Ins. Co. v. Lacelaw Corp.*, 861 F.2d 224, 226 (9th Cir. 1988) ("Factual assertions in pleadings and pretrial orders, unless amended, are considered judicial admissions conclusively binding on the party who made them."). Plaintiff may not argue, therefore, that the issuance of employee stock options constitutes a triggering event.

Warrants. Defendants urge that the Court's motion to dismiss orders preclude Plaintiff from relying on warrants as triggering events under the Notes as well. Dkt. No. 126 at 12–13. However, Plaintiff continues to argue that the issuance of warrants constitutes a triggering event. *See* Dkt. No. 128 at 14–15. Plaintiff points out that under either California or Virginia law, proving fraudulent inducement would permit him to rescind the entire Settlement Agreement, including his own representation that the "issuance . . . of common options and/or warrants do not constitute" a triggering event.[5] *Id.*; *see also* Hejinian Decl., Ex. 36 at § 5(a)). *Id.*

Yet again, Plaintiff's argument has become clearer over time. In opposition to the first motion to dismiss, Plaintiff argued that his fraudulent inducement claim should not be dismissed based on the Settlement Agreement because the Settlement Agreement "was a key component" of Defendant's alleged scheme to defraud him. *See* Dkt. No. 41 at 4–7. He pointed out that California law contains "principles permitting one who has been fraudulently induced into signing

---

[5] The Notes state that California law applies to them, *see* Dkt. No. 126-4, Ex. B at § 12 ("This Note shall be governed by and construed under the laws of the State of California . . . ."), and the Settlement Agreement states that Virginia law applies to it, *see* Dkt. No. 126-10, Ex. H at § 9(i) ("This Agreement will be governed by the laws of the Commonwealth of Virginia.").

a contract to either seek recission thereof or to affirm the contract and sue for fraud." *See id.* at 4. It is not clear from the subsequent discussion, however, whether Plaintiff was suggesting that he intended to rescind the Settlement Agreement, in part or in full, or affirm it and sue for fraud. *See id.* at 4–7. And in discussing the language in the Settlement Agreement that warrants are not triggering events, Plaintiff did not argue, as he does now, that such language is unenforceable because he has the right to rescind the entire agreement. Instead, he urged that Defendants "slipped [the provision] past Richards unawares" during the drafting process. *Id.* at 7. The Court therefore did not squarely address this (unpresented) recission argument in the First MTD Order. The Court pointed out in a footnote that Plaintiff's failure to read a contract does not excuse him from his obligations under it. *See* First MTD Order at 5, n.4. And substantively, the Court briefly noted that Plaintiff had "specifically ceded that 'issuance of options and/or warrants' would not trigger the right to convert or notice of the same." *See id.* at 9.

Still, the Court acknowledges that in his Prayer for Relief in the First Amended Complaint and the Second Amended Complaint, Plaintiff requested "[r]ecission of the fraudulently-obtained 2019 settlement agreement." *See* Dkt. No. 26-1, Ex. A at 41; Dkt. No. 53 at 51. And in his opposition to the second motion to dismiss, Plaintiff more directly argued that "[a]s fraudulently-induced contracts – including settlement agreements – are null and void (also under both California and Virginia law), Defendants cannot rely on any provision of an agreement that has yet to be proven to be valid." Dkt. No. 69 at 21. But as noted above, the Court did not revisit its prior order or specifically address whether Plaintiff could argue that the issuance of warrants constitutes triggering events under the Notes. *See* Second MTD Order. The parties never sought further clarification.

Now that the record has been made and the Court more fully understands Plaintiff's position, the Court finds that notwithstanding the orders on the motions to dismiss, Plaintiff is not precluded from arguing that the issuance of warrants constituted triggering events. The Court does so out of an abundance of caution. Although Plaintiff may not be bound by the terms of the Settlement Agreement if he can establish that he was fraudulently induced to enter into it, the Court notes that its terms may still be relevant at trial. Plaintiff's explicit acknowledgement in the

11

Settlement Agreement that Centripetal's "issuance of common options and/or warrants do [*sic*] not constitute a Next Non-03 Round" and that "the issuance of any such options or warrants does not trigger any right or entitlement to conversion provided for in the Notes" may still provide insight into what the parties actually believed were triggering events under the Notes. Plaintiff has not, to date, offered any persuasive argument that would allow him to sidestep that language—and his apparent admission—in the Settlement Agreement entirely.

<u>Convertible Notes.</u>  Similarly, Defendants suggest that the Court's prior motion to dismiss orders somehow preclude Plaintiff from asserting that the issuance of convertible notes triggered his conversion rights. *See* Dkt. No. 126 at 13–14. But as Defendants recognize, Plaintiff did not allege that the issuance of convertible notes triggered his conversion rights until the second amended complaint. *Id.* So the Court had no occasion to address this issue in the First MTD Order. In their second motion to dismiss, Defendants suggested that Plaintiff's breach of contract claim based on such convertible notes was barred by the statute of limitations. *See* Dkt. No. 63 at 7. However, in the Second MTD Order the Court rejected Defendants' timeliness argument, declining to address questions of disclosure and reasonable diligence at the motion to dismiss stage. *See* Second MTD Order at 7–8. The Court's prior orders, therefore, do not preclude Plaintiff from arguing that the issuance of convertible notes constitutes triggering events.

In their reply brief, Defendants also suggest that Plaintiff cannot rely on any triggering events that are not explicitly alleged in the complaint. *See* Dkt. No. 133 at 6–7. They cite no legal authority for this sweeping proposition, and the Court declines to adopt it here. Through discovery Plaintiff may have found additional events—such as warrants or convertible notes—that he was previously unaware of, and Defendant has not provided any reasoned basis to preclude Plaintiff from pursuing them now.

### B.  Notice of Triggering Events

Defendants argue that even assuming Plaintiff's broad interpretation of "equity securities" is accurate and encompasses the alleged triggering events above, Plaintiff had actual knowledge of them. *See* Dkt. No. 126 at 15–21. Consequently, Defendants urge that Plaintiff's causes of action are untimely, and that he could not have reasonably relied on Defendants' statement that no

12

triggering events occurred for purposes of his fraud claims. *See id.* But the Court finds that there are genuine disputes of material fact regarding whether Plaintiff knew or should have known of the triggering events.[6]

Under the Notes, Defendants had an affirmative obligation to provide Plaintiff written notice "at least 30 calendar days prior to the closing" of any triggering event. *See* Dkt. No. 126-4, Ex. B at ¶ 4; Dkt. No. 126-5, Ex. C at ¶ 4. Defendants appear to have provided such formal notice only once. *See* Hejinian Decl., Ex. 7; *see also* Richards Decl. at ¶ 12. Defendants do not present evidence that they provided Plaintiff with any additional formal, written notice. Rather, Defendants contend that Plaintiff either (1) acknowledged that he had actual notice of the alleged triggering events; or (2) should have known of them based on information in his possession.

Stock Option Exercises. Defendants point out that during Plaintiff's deposition, he testified that he knew Defendants had issued stock to employees upon the exercise of their stock options. *See* Dkt. No. 126 at 7–8, 15–16. Defendant appears to overread Plaintiff's deposition testimony. When asked directly whether Plaintiff knew that employees has exercised stock options, he responded that "I can't say with certainty at that point in time I did." *See* Dkt. No. 126-3, Ex. A ("Richards Depo.") at 76:6–9; *see also id.* at 89:1–4. Plaintiff acknowledged that he had received financial statements that showed that stock options had been exercised. *Id.* at 76:9–18, 89:1–11. However, he did not admit that he reviewed the statements and saw that stock options had indeed been exercised. *Id.* Plaintiff states that he "only looked causally at these statements and did not review them in search of triggers for my notes." *See* Richards Decl. at ¶ 13. He asserts that he instead relied on Defendants, as required under the Notes, to provide him with the necessary notice. *See id.* at ¶ 46. Plaintiff also contends that it took him significant time to piece together what triggering events had occurred "because the true nature of many of the triggering events were either mislabeled, disguised, or not reported in Centripetal's financial reports." *See id.* at ¶¶ 46–58.

---

[6] Plaintiff "concedes that any breach claim based on the April 2017 issuance of the convertible note and warrant is time-barred." *See* Dkt. No. 128 at 19, n.8. The Court therefore does not address that here.

<u>Warrants.</u>  Defendants also point out that Plaintiff testified that he knew warrants had been issued.  *See* Dkt. No. 126 at 7–8, 16.  But again, Plaintiff's deposition is not entirely clear.  At one point Plaintiff appears to acknowledge that he was aware of a single warrant that was issued in 2017.  *See* Richards Depo. at 72:14–19.  But then elsewhere he states "when I really focused on the fact that there were warrants in the [documents Defendants disclosed], I can't recall the date of that."  *See id.* at 98:15–24.  And he also stated "I still don't understand the 16 million warrants."  *Id.* at 99:12–15.

<u>Convertible Notes.</u>  Defendants also assert that Plaintiff testified that he knew that convertible notes had been issued.  *See* Dkt. No. 126 at 9, 16.  But like the warrants, Plaintiff did not definitively state when he became aware that such convertible notes had been issued.  Plaintiff has only suggested that he knew about the issuance of one in 2017.  *See* Dkt. No. 128 at 19, n.8.  Even as to that convertible note, however, Plaintiff explained in his declaration that "[d]ue to the various misleading characterizations in Centripetal's financial statements . . . I was unsure whether the note issued to Mr. Smith in April 2017 was a convertible note until it was confirmed in discovery in this case."  *See* Richards Decl. at ¶ 60.

Even assuming Plaintiff had financial documents in his possession that disclosed all of these potential triggering events at the time, there remain factual disputes about the reasonableness of Plaintiff's conduct, including what Plaintiff reviewed and when he reviewed it, and whether such documents should have put Plaintiff on notice of these alleged triggering events.

\*   \*   \*

At least as currently presented, Plaintiff's version of events is not overwhelmingly persuasive.  And in the face of Defendants' evidence, Plaintiff appears to rely heavily on the standard of review and his ipse dixit about the meaning of the Notes and the parties' Settlement Agreement.  That stance will be tested at trial, where Plaintiff will no longer be entitled to any presumptions.  Nevertheless, drawing all inferences in Plaintiff's favor as it must at this stage, the Court finds that Plaintiff has raised at least one genuine dispute of material fact precluding summary judgment.  *See* Fed. R. Civ. P. 56(a).  The Court therefore **DENIES** the motion.  However, as discussed above, Plaintiff is precluded from arguing at trial that the issuance of

14

1  employee stock options constitutes a triggering event.

## IV. CONCLUSION

The Court **DENIES** the motion for summary judgment.  Dkt. No. 126.  The prior scheduling order remains in effect.  Dkt. No. 61.  The Court understands that the parties attempted to mediate this case in May, and it did not settle.  *See* Dkt. No. 85.  Nevertheless, given the current stage of the case, the Court is inclined to refer the case to a magistrate judge for a settlement conference in advance of the bench trial in March 2025.  The parties are therefore **DIRECTED** to meet and confer and file a status report of no more than two pages by January 28, 2025, addressing whether they believe a settlement conference would be a productive use of everyone's time.  The case schedule otherwise remains in place.

**IT IS SO ORDERED.**

Dated:    1/21/2025

HAYWOOD S. GILLIAM, JR.
United States District Judge

15